316 Ga. 639
FINAL COPY

S23A0316.  MUSE v. THE STATE.
S23A0373.  HARRIS v. THE STATE.
S23A0427.  HARRIS v. THE STATE.

BOGGS, Chief Justice.

Appellants Durell Muse, Darious Harris, and Jujuane Harris, Darious's brother, appeal from their convictions following a joint trial for malice murder and other crimes stemming from the shooting death of Antonio Clements, the shooting of Clements's girlfriend, Kendra Clopton, and the firing of shots that struck a vehicle occupied by Silento Bell and Yolanda Davis.  On appeal, all three Appellants challenge the sufficiency of the evidence to support certain of their convictions; contend that the trial court violated the continuing witness rule by allowing the jury to watch surveillance videos in the jury room during deliberations; and claim that the trial court violated certain of their rights when addressing notes from the jury. In addition, Muse and Darious contend that the trial court erred by failing to exclude evidence extracted from Muse's cell

phone; Muse contends that his trial counsel was ineffective in failing to raise a hearsay objection to testimony from a State's witness; Darious and Jujuane contend that the trial court erred in failing to sever their trials; and Darious contends that he is entitled to a new trial because the trial court erred in failing to exclude the testimony of a State's witness and because the State represented during the motion for new trial proceedings that the record was incomplete.[1]

---

[1] Clements and Clopton were shot on September 23, 2014. On January 2, 2015, a Fulton County grand jury indicted all three Appellants, along with Tequila Forehand and Frederick Rosenau, for participation in criminal street gang activity (Count 1); malice murder (Count 2); criminal attempt to commit murder based on the shooting of Clopton (Count 3); two counts of felony murder, one count predicated on aggravated assault (Count 4) and the second count predicated on participation in criminal street gang activity (Count 5); four counts of aggravated assault committed against Clements (Count 8), Clopton (Count 9), Bell (Count 10), and Davis (Count 11); two counts of conspiracy to commit murder (Counts 12 and 13); criminal damage to property (Count 14); and possession of a firearm during the commission of a felony (Count 15). Forehand and Muse alone were indicted for felony murder predicated on possession of a firearm by a convicted felon (Counts 6 and 7, respectively) and possession of a firearm by a convicted felon (Counts 16 and 17, respectively).

At the beginning of a joint trial, the trial court announced that Rosenau would be tried separately. The record does not reflect whether he has been tried. At the joint trial for the Harris brothers, Muse, and Forehand from April 24 to May 2, 2017, a jury found the four co-defendants guilty on all counts against them, except Count 14 (criminal damage to property) on which the trial court directed a verdict. On May 22, 2017, the trial court sentenced all three Appellants to life in prison for malice murder, with Muse's sentence to be served without the possibility of parole; a consecutive term of 30 years in prison

2

We conclude that the evidence was sufficient to support Appellants' convictions; that the trial court did not violate the continuing witness rule; that the trial court did not violate rights of Appellants when addressing certain notes from the jury; and that any violation of Appellants' rights when addressing other notes was harmless. We also conclude that the trial court did not err by failing to exclude evidence extracted from Muse's cell phone; that Muse has failed to establish prejudice on his claim that trial counsel was

for criminal attempt to commit murder; a consecutive term of 15 years in prison for participation in criminal street gang activity; and terms of 20 years in prison on two aggravated assaults, with Muse's sentences to run consecutively. Muse and Darious Harris were sentenced to a consecutive term of five years in prison for possession of a firearm during the commission of a felony, while Jujuane Harris received a five-year probated sentence, to be served consecutively. Muse was sentenced to a consecutive term of five years in prison for possession of a firearm by a convicted felon. The felony murder convictions against all three Appellants were vacated by operation of law. The trial court merged Counts 8 and 9 (aggravated assaults against Clements and Clopton, respectively) and Counts 12 and 13 (both charging conspiracy to commit murder) for purposes of sentencing.

All three Appellants timely filed motions for new trial, which were amended with new counsel on various dates through 2021. After hearings in 2021, the trial court denied the amended motions in separate orders entered in September and October 2022. All three Appellants filed timely notices of appeal. Muse and Darious Harris's cases were docketed in this Court to the term beginning in December 2022, while Jujuane's case was docketed to the April 2023 term. All three cases were submitted for decisions on the briefs. There is no appeal by Forehand currently before us.

ineffective in failing to raise a hearsay objection; that the trial court did not abuse its discretion in denying Darious's and Jujuane's motions to sever; that the trial court did not err in failing to exclude the testimony of a State's witness; and that Darious is not entitled to a new trial on the ground that the State represented during the motion for new trial proceedings that the record was incomplete. Accordingly, we affirm Appellants' convictions.

1. The evidence presented at trial showed the following. On September 23, 2014, Darious and Harris (also known, respectively, as "Diablo" and "Mambo"), along with five other passengers, rode in Darious's tan Chevrolet Tahoe to a gas station at the intersection of Campbellton Road and Stanton Road in Fulton County. At almost the same time, Muse, Tequila Forehand, and Frederick Rosenau arrived at the gas station in Muse's dark blue Chevrolet Impala. While there, Appellants saw a gray car, which they thought was occupied by people with whom they had been feuding. Instead, the car was occupied by Clements and Clopton. Occupants of Appellants' two vehicles opened fire on the car occupied by Clements and

4

Clopton, killing Clements and injuring Clopton.

More particularly, Clopton testified that, just before the shooting, she and Clements were driving down Stanton Road to the gas station to buy cigarettes before the store closed at midnight. Clopton testified that Clements was driving and that, as they approached Campbellton Road and began turning left into the gas station, a bullet struck her passenger window. According to Clopton, Clements tried to back up but a bullet struck him in the head, and their car stopped. Clopton "crawled behind the car and laid down." In the meantime, shots were still being fired. Clopton added that she was behind the car about 30 seconds and that while she was there, the shots stopped. She then saw a vehicle drive off at a "high rate of speed"; she could not identify the vehicle and was not even "sure [if] it [was] a truck or a car." After the vehicle drove off, she ran to the gas station for help. Clopton could not identify the shooter or the car that she saw drive away from the gas station. A 911 call reporting the incident was made at 11:48 p.m., and law enforcement officers arrived shortly thereafter. Clopton had been grazed by a bullet on

5

the top of her head, and Clements died from the injuries caused by the bullet wound to his head.

Silento Bell testified that at 11:50 p.m. on September 23, 2014, he and his wife, Yolanda Davis, were driving down Campbellton Road and that as they were passing the traffic light at the intersection of Campbellton and Stanton Roads, an "object" hit their windshield and then "a lot of shooting started." He ducked down, "went into defense mode," was "trying to get out of harm's way," and was "trying not to get shot." Once he looked up, he saw a black Impala and a yellow Chevrolet Tahoe, with its lights off, "shoot past" him "at a high rate of speed." He added that both vehicles had come out of the gas station. On cross-examination, when asked how many times he had "actually been shot at," Bell responded that "they wasn't shooting at [him]." Bell also testified on cross-examination that his car was not struck by a bullet but by what he "assum[ed]" was a brick. He added that any bullet holes that the police found in his car were from a previous shooting. However, on redirect, Bell testified that a bullet could have hit the windshield and added that

6

he did not "know what the object was."

Davis agreed with Bell's description of events, but she testified that a bullet and not a brick struck their car, and she described Darious's vehicle as a "white Suburban" instead of a Tahoe. Davis also testified that before the shooting, she saw the Impala parked by a gas pump at the gas station and the Suburban in front of the station. She added that, after the shooting, both vehicles left the gas station at a high rate of speed. Over Jujuane's hearsay objection, Davis testified that, on the night of the crimes, Bell told law enforcement officers the same thing that she did about what happened "in every respect."

The gas station had a video surveillance system that consisted of a number of cameras recording activity at various parts of the exterior and interior of the gas station. A number of video clips from the recording system were played at trial. Appellants do not dispute that Darious's Tahoe and Muse's Impala are depicted in the video clips. Those clips and other testimony at trial showed that, on September 23, 2014, Muse's Impala and Darious's Tahoe arrived at

7

the gas station within a few seconds of each other around 11:43 p.m. Muse's Impala parked at a gas pump on the side of the gas station near the intersection of Campbellton and Stanton Roads, and Darious's Tahoe parked in front of the gas station close to an exit on Campbellton Road. Around 11:45 p.m., Darious got out of the driver's door of the Tahoe and opened the back door on the driver's side. A video clip from inside the gas station showed that Rosenau and Forehand went inside the gas station shortly after 11:44 p.m. and went back outside shortly after 11:45 p.m. While Forehand and Rosenau were inside the gas station, a man, who was not identified at trial, got out of the Impala, opened the trunk, and got something out of it. Forehand approached the Tahoe at 11:45:35 p.m., spoke with Darious and other occupants, and then, at 11:46:13 p.m., walked in the direction of the Impala. Forehand approached the Tahoe again at 11:46:22 p.m., stood by the driver's door, leaned in the driver's door and looked toward the back seat, and then, at 11:46:30 p.m., walked in the direction of the Impala. Immediately after Forehand walked away from the Tahoe, Jeremiah McKenzie,

8

who testified and identified himself in the video clip, approached the Tahoe and spoke with Darious. At 11:46:50 p.m., McKenzie walked away from the Tahoe. A few seconds later, several men got out of the Tahoe and began shooting in the direction in which the Impala was parked. The victims' car was located on the other side of the Impala at that time, attempting to turn into the gas station from Stanton Road. There was no testimony regarding the identity of the shooters who emerged from the Tahoe, and there was no video clip of what was happening at the Impala at the time of the shooting. The Impala and the Tahoe are shown driving away from the gas station at 11:47:30 p.m., pulling out onto Campbellton Road.

McKenzie testified that he knows Darious as Diablo and Jujuane as Mambo and that he and the Harris brothers lived in the same neighborhood near the gas station. McKenzie testified that he saw the Tahoe park at the gas station and that he knew it was owned by Diablo. According to McKenzie, shortly after the Tahoe parked, he saw Darious get out of the front driver's door of the Tahoe and open the back door on the driver's side. McKenzie added that, a short

time later, a female that he knew as "Red Rose" approached the vehicle. After Red Rose walked away from the Tahoe, McKenzie walked up to it and asked, "What's going on?" He added that there were seven occupants of the Tahoe, but that he only recognized Diablo, who was sitting in the front driver's seat, and Mambo, who was sitting in the front passenger seat. McKenzie testified that he saw a "whole bunch of guns," adding that everyone in the car had a gun except "[a]bout two people." The occupants told McKenzie to "[m]ove back," and Diablo said "green light" or "go." McKenzie moved away from the Tahoe. McKenzie testified that, at that time, a gray car was turning into the gas station and "[t]hat's when they started shooting." According to McKenzie, Red Rose, who was near a gas pump, was the first person who started shooting, followed by men from the Tahoe. When asked on cross by Darious's counsel if he had seen Diablo and Mambo with a weapon, McKenzie said, "there was so many [guns], I just can't say they had one. But I didn't see them get out of the truck."

McKenzie also testified that he had seen them at the gas

station earlier on the day of the crimes. According to McKenzie, they were "just standing around there kicking it" when Diablo's and Mambo's sister approached them and said that "[s]ome guys are looking for you in a gray car." McKenzie added that he had seen Diablo, Mambo, and others "feuding" or "beefing" with individuals in a gray car for "a whole week," and that "Diablo and them" were part of the Bloods gang, while the people in the gray car were part of the Crips gang.

Investigator T. Bacon of the City of Atlanta Police Department investigated the crime scene. He testified that the victims' car was struck by nine bullets, with three bullets striking the front passenger window. He added that he found a large number of shell casings at the crime scene. Vanna Kelly, a GBI firearms expert, testified that the four .45-caliber shell casings found at the scene were fired from the same firearm; that 13 9mm shell casings found at the scene were fired from the same firearm; that 11 other 9mm shell casings were fired from a different 9mm pistol; that two other 9mm shell casings were fired from yet a third 9mm pistol; and that

27 7.62 x 39 millimeter shell casings found at the scene were all fired from the same firearm. Kelly also testified that the 7.62 x 39 shell casings were "consistent with being fired from an AK-47 or SKS-type rifle." The 7.62 x 39 shell casings were found in the area where the Impala had been parked at the gas station.

Kasandra Novinger, who was a probation officer for the Georgia Department of Corrections in November 2014, testified that Muse was called for a probation visit based on information[2] that her office had received from Detective Summer Benton of the Atlanta Police Department. She testified that, when she first encountered Muse at the office, he seemed fine, but that once she informed him that the office would be conducting a urine screen, as well as a search of his cell phone and car, he "began to show obvious signs of anxiety," with his breathing becoming heavier and shaky. While waiting to do the urine screen, Muse vomited in the lobby of the office. During the search of Muse's car, three spent 7.62 x 39

---

[2] This information concerned an incident separate from the crimes that occurred in this case.

millimeter shell casings were found in the back seat. Kelly testified that those casings were fired from the same firearm that fired the 7.62 x 39 shell casings found at the crime scene.

Sergeant Lakea Gaither testified that she had been a detective in the gang unit of the Atlanta Police Department for over seven years and had encountered over a thousand gang members during that time. She testified that the Bloods are a criminal street gang acting within Fulton County and that the "Nine Trey Bloods," nicknamed "Billy Bad Ass," are a sect of the larger Bloods gang. That sect calls their female members terms like Lady, Ruby, or Rose. She added that the Billy Bad Asses ("BBAs") used symbols like five-point stars, a skull, "five symbols," and BBA tattoos to identify themselves. According to Gaither, Forehand claimed membership in the BBAs and had a five-point star on the side of her face. She also testified that on Muse's Facebook page, he went by the name "Finessalino" and that members of the Nine Trey Bloods attached "lino" to the end of their names. Gaither added that she had learned from two investigators in the gang unit that Darious and Jujuane

13

were affiliated with the Nine Trey Bloods. Finally, Gaither testified that Rosenau was a member of the Nine Trey Bloods and was known as "Gangster P" or "GP." She added that there were "social media pictures with him throwing up gang signs . . . with other Nine Trey members" and that he "was a low, L-O-W, 020, which is . . . like third in rank of a particular gang."

Detective Kevin Leonpacher, who was trained in cell phone analysis, testified that information that he obtained from the carrier of Muse's cell phone showed that, shortly before the 911 call reporting the incident at 11:48 p.m., Muse's cell phone made a call that hit off a cell tower in the same geographic area as the crime scene. Moreover, the evidence showed that Muse's cell phone made a call at 11:51 p.m. that hit off that same cell tower but on a different side of it and that his phone made a call at 11:54 p.m. that hit off a cell tower that was farther away from the crime scene. Leonpacher added that he had examined 30 days of calls made using Muse's cell phone and that the calls made before and after the shooting were made to numbers that were in the top seven of numbers most

14

frequently called from Muse's phone.

In addition, Investigator Jared Watkins testified that he performed a "phone dump" of Muse's cell phone, which involved using a software program to extract information from the phone. The messages that Watkins extracted from Muse's cell phone showed that Muse received an incoming message on November 2, 2014, that said that "[h]e who walks by these principles walk the life of Billy. Loyalty is everything. Remember that. Y'all, loyalty lays with Billy first and those who brought you to Billy secondly. I love my Billy." Another message sent on October 25, 2014, reads: "This Billy is more than a gang, it's a life for Billy, and we do the same in return. It's not about staying either. It's in or you're out. Your decision in this life." There was a message sent from Muse's phone on September 25, 2014, saying that "[a]s of today, everyone report directly to Finessalino." Moreover, at 11:17 p.m. on September 23, the night of the shooting, Muse's phone sent a message saying, "Well, I'm in some issue right now, so I'm out." Then, in the early morning of September 24, Muse's phone sent a message saying,

15

"Don't no one take that stick from there." At 4:42 a.m. on September 24, Muse's phone received a message from a person named Nick Elder saying, "Nothing on news twin." At 9:06 a.m. that same day, Muse's phone sent a message to Elder saying, "Already seen it." Then, at 9:26 a.m., the phone sent a message to "Rose" that read, "Yo, make sure you get my little bros to get those 7/62 by 39 by the time I get back today." In addition, at 12:30 p.m. on September 24, Muse's phone sent a message that said, "7/62 by 39." The next message the phone sent said "Bullets." Muse's phone also contained a video of an unidentified man in the back seat of a car holding a firearm that Investigator Watkins identified as an AK-47. Watkins described a "stick" as a "street term" for a "firearm" and testified that the only firearms that could fire "7/62 by 39" ammunition were "an AK-47 and . . . an SKS."

Both Darious and Jujuane were interviewed by Detective Benton before trial. Benton interviewed Jujuane on September 27, 2014. Benton testified that Jujuane denied being at the crime scene, saying that he was at home when the crimes occurred. Jujuane also

16

said that he "hung around Bloods," particularly the BBAs, but "was not involved with them." During a second interview with Benton on October 6, 2014, Jujuane first denied being at the scene, but then admitted that he was in the front seat of the Tahoe when the shooting occurred and that he heard someone say "[t]here they go." However, he denied knowing "what was about to go down" and denied knowing anyone who was sitting in the back seat of the Tahoe.

Detective Benton interviewed Darious on October 10, 2014. She testified that Darious initially denied that he was at the crime scene and said that he owned a Buick vehicle, but that after the detective informed him that she had spoken with Jujuane, Darious admitted that he was there and that he owned a Chevrolet Tahoe. He also admitted that he arrived at the gas station on the night of the crimes at roughly the same time as the Impala and that he had been in hiding after the crimes were committed but for a reason other than the crimes in question. Darious denied knowing the people who were sitting in the back of his Tahoe on the night of the

17

crimes. Like Jujuane, he denied being a member of the Bloods but said that he "does hang out with a few members."

Muse was the only defendant to testify at trial. He acknowledged that he and Rosenau are members of the Bloods gang, but testified that he was not at the gas station during the shooting incident. He added that Rosenau had dropped him off at a girlfriend's house around 8:00 p.m. on the night of the incident, that Rosenau took Muse's Impala "to make a little run," and that he (Muse) left his cell phone in the Impala to charge because he did not have a wall charger. According to Muse, he stayed at his girlfriend's home about three hours, and she then drove him to the nearby home of a friend and dropped him off. Muse testified that later that evening, Rosenau came to his friend's home, and "[e]verybody [was] kind of frantic, they were, like, shooken up about something." Muse did not say who was with Rosenau, but he testified that "they didn't go into too much detail[ ]" and took off. Muse testified that, at the time of the incident, he did not know either of the Harris brothers.

2. All three Appellants contend that the evidence presented at

trial was constitutionally insufficient to support their convictions for the crimes committed against Clements, Clopton, Bell, and Davis. In particular, Muse claims that there was no evidence presented at trial that he participated in the incident that led to the shooting that killed Clements and injured Clopton, correctly noting that no witness identified him at the crime scene and that the surveillance video did not show him as being present at the gas station. For their part, Darious and Jujuane contend that the evidence showed only that they were merely present at the crime scene and that they did not fire or possess a weapon. We disagree.

When evaluating the sufficiency of the evidence as a matter of federal due process, we view the evidence presented at trial in the light most favorable to the verdicts and consider whether it was sufficient to authorize a rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Moore v. State*, 311 Ga. 506, 508 (858 SE2d 676) (2021). This "limited review leaves to the jury the resolution of

conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts." *Rich v. State*, 307 Ga. 757, 759 (838 SE2d 255) (2020) (cleaned up).

Moreover, to prove Appellants' guilt, it was not necessary for the State to prove that Appellants possessed a weapon or fired at the victims. See *Saylor v. State*, 316 Ga. 225, 229 (887 SE2d 329) (2023). ("To prove [the defendant's] guilt, the State was not required to prove that he personally fired at [the victim] or his vehicle.").

> OCGA § 16-2-20 (a) makes a party to the crime equally culpable, and a defendant is a party to a crime if he "[i]ntentionally aids or abets in the commission of the crime" or "[i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime." OCGA § 16-2-20 (b) (defining "party to a crime").

Id. See also *Clark v. State*, 315 Ga. 423, 428 (883 SE2d 317) (2023) (holding that although the evidence at trial showed that the defendant did not fire the shot that killed the victim, the evidence showed that he was a party to that crime and was constitutionally sufficient to support his conviction); *White v. State*, 298 Ga. 416, 418

(782 SE2d 280) (2016) (holding that the "fact that [the defendant] was merely the driver and did not actually fire the gun does not undermine the legal sufficiency of the evidence against him" where the evidence showed that he was a party to the crimes). "Conviction as a party to a crime requires proof of a common criminal intent, which the jury may infer from the defendant's presence, companionship, and conduct with another perpetrator before, during, and after the crimes." *Clark*, 315 Ga. at 427. "However, mere presence at the crime scene is insufficient to make someone a party to a crime." Id. at 427-428.

Viewed in the light most favorable to the verdicts, the evidence at trial showed that Darious's Tahoe and Muse's Impala arrived at the gas station at almost exactly the same time and that numerous passengers in Darious's Tahoe were armed. Moreover, Darious, Jujuane, Muse, Forehand, and Rosenau were all identified as members of the Bloods gang. McKenzie, who knew Darious and Jujuane, testified that they had been feuding with members of the Crips gang in the week preceding the shooting. There was also

21

evidence that the members of the Crips gang were driving a gray car and that Darious's and Jujuane's sister had told them earlier on the day of the shooting that "some guys" in a gray car were looking for them. Surveillance video showed that Darious spoke with Forehand, a fellow gang member and occupant of Muse's car, at his Tahoe on two occasions, the last one just seconds before 59 shots were fired in the direction of the gray car turning into the gas station, which also happened to be in the direction of the car occupied by Bell and Davis. The evidence showed that Clements was killed by one of the bullets fired, that Clopton was hit by one, and that Bell's and Davis's car was struck by one. Moreover, those shots were fired, at a minimum, by Forehand and several occupants of Darious's Tahoe, just after McKenzie heard Darious say "green light" or "go." Furthermore, immediately after the shooting, Darious's Tahoe and Muse's Impala sped away from the gas station together. There was also evidence that calls were placed by Muse's cell phone while it was located near the crime scene shortly before and shortly after the shooting and that those calls were made to people that Muse frequently called.

22

Muse's cell phone was also used to send text messages after the crimes that said not to move a firearm and to "make sure you get my little bros to get those 7/62 by 39," one of the types of ammunition used in the shooting, "by the time I get back today." In addition, when Muse realized that his cell phone and vehicle would be searched about a month and a half after the crimes, he displayed extreme anxiety, including vomiting. And when law enforcement officers searched his car, they found three spent 7.62 x 39 millimeter shell casings that had been fired from the same firearm that fired the 7.62 x 39 shell casings found at the crime scene. Moreover, the 7.62 x 39 shell casings found at the crime scene were found around the location where Muse's Impala had been parked.

We conclude that the evidence was sufficient as a matter of constitutional due process to authorize a rational trier of fact to find Appellants guilty beyond a reasonable doubt as parties to the crimes committed against Clements, Clopton, Bell, and Davis, including malice murder, even if they did not possess or fire a weapon. See *Jackson*, 443 U.S. at 319; OCGA § 16-2-20; *Clark*, 315 Ga. at 427-

23

428; *White*, 298 Ga. at 418. Moreover, although Muse points out that he presented an alibi defense at trial, testifying that Rosenau borrowed his vehicle and that Muse left his phone in the vehicle so that it could charge, the jury was authorized to reject that testimony and credit the foregoing evidence of his participation in the crimes. See *Pittman v. State*, 300 Ga. 894, 897 (799 SE2d 215) (2017) (holding that the jury was entitled to disbelieve the defendant's alibi and credit other evidence, "as resolving evidentiary conflicts and inconsistencies and assessing witness credibility are the province of the fact finder, not the appellate court" (cleaned up)).

In addition, Muse's contention that the evidence was insufficient to support his conviction for the aggravated assault of Bell because Bell testified that "they wasn't shooting at [him]" and that it was a brick and not a bullet that hit his car is without merit. To begin, the indictment charged Muse with committing an aggravated assault against Bell "by shooting at, towards, and in his direction with a firearm, the same being a deadly weapon," so it was not necessary for the State to offer proof that a bullet struck Bell's

car for Muse to be convicted of aggravated assault. Moreover, there are two methods of committing a simple assault that will support an aggravated assault charge. One is the "[a]ttempt[ ] to commit a violent injury to the person of another," and the second is the commission of "an act which places another in reasonable apprehension of immediately receiving a violent injury." OCGA § 16-5-20 (a) (1), (2). Here, the trial court instructed the jury only on the first method of committing a simple assault and charged the jury on the doctrine of transferred intent. Thus, although Bell testified that he did not think that the defendants were shooting at him, the charge on transferred intent made "it irrelevant" whether Bell was the intended victim of the assault. See *Russell v. State*, 303 Ga. 478, 480 (813 SE2d 380) (2018) (holding that the doctrine of transferred intent made "it irrelevant" whether the defendant intended to shoot a victim who was intervening in a fight between the defendant and the intended victim of the shooting). Finally, Muse appears to contend that the State failed to prove that Bell was not in "reasonable apprehension of immediately receiving a violent injury,"

OCGA § 16-5-20 (a) (2), because Bell stated that he believed Appellants were not shooting at him. The jury was not charged on that method of committing a simple assault, however. In sum, the evidence was sufficient as a matter of constitutional due process to support Muse's conviction for the aggravated assault of Bell even though Bell was not the intended victim of the shooting. See *Blackwell v. State*, 302 Ga. 820, 821-822 (809 SE2d 727) (2018) (holding that, even though the victim was not the intended target of a gunfight and even though the defendant did not fire the fatal shot, the evidence was sufficient to support the defendant's conviction as "a party to the crime of malice murder under the doctrine of transferred intent" because it showed that the defendant shared a common criminal intent with another person "to engage in a gunfight in the presence of innocent bystanders").

Finally, Jujuane's contention that the evidence was insufficient to support his convictions as a matter of Georgia statutory law for the crimes against Clements, Clopton, Bell and Davis, see OCGA §

26

24-14-6,[3] fails. He argues that the State's evidence did not exclude the reasonable hypothesis that he was merely present at the crime scene as a passenger in the Tahoe. However, "where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of the guilt of the accused, we will not disturb that finding unless it is insupportable as a matter of law." *Smith v. State*, 315 Ga. 357, 358 (882 SE2d 289) (2022) (cleaned up). Here, even assuming all the evidence was circumstantial, we readily conclude that the evidence as summarized above was sufficient to authorize the jury to reject the hypothesis that Jujuane was merely present at the crime scene and, instead, to find that he was a party to the crimes committed that night. See id.

3. Darious and Jujuane also challenge the sufficiency of the evidence regarding their convictions for criminal street gang

---

[3] OCGA § 24-14-6 provides: "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."

activity.[4] We disagree.

Darious and Jujuane were charged with violating the Street Gang Act, on the basis that while associated with a criminal street gang, they participated in criminal gang activity through the commission of at least one of several crimes, including murder, felony murder, and aggravated assault. To convict Darious and Jujuane,

> the State had to prove beyond a reasonable doubt the existence of a "criminal street gang," that [Darious and Jujuane] w[ere] associated with the gang, that [they] committed one of the offenses listed in OCGA § 16-15-3 (1), and that the commission of the predicate offense was intended to further the interests of the gang.

*Sillah v. State*, 315 Ga. 741, 745 (883 SE2d 756) (2023).

Darious and Jujuane do not argue that the Nine Trey Bloods are not a criminal street gang. See OCGA § 16-15-3 (3) (defining a "criminal street gang" as "any organization, association, or group of

---

[4] Muse challenges the sufficiency of the evidence supporting his conviction for criminal gang activity only on the ground that the State failed to prove that he committed a predicate act of violence. See OCGA § 16-15-3 (1) (J).

three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity"). Instead, they argue that the State failed to prove the other elements of criminal gang activity. As for whether the evidence was sufficient to prove that Darious and Jujuane were associated with the Nine Trey Bloods, McKenzie testified that he knew Darious and Jujuane from his neighborhood and that they were associated with the Bloods gang. Although Darious contends that McKenzie's testimony was not credible,[5] "'it is axiomatic that resolving evidentiary conflicts and assessing witness credibility are within the exclusive province of the jury.'" *McCoy v. State*, 315 Ga. 536, 543 (883 SE2d 740) (2023) (quoting *Graves v. State*, 298 Ga. 551, 553 (783 SE2d 891) (2016)). Moreover, in addition to McKenzie's testimony, Sergeant Gaither testified that Darious and Jujuane were associated with the Nine Trey Bloods. Jujuane points to the lack of evidence that he had tattoos, wore gang

---

[5] Darious argues that McKenzie's testimony was not credible because he had three prior felony convictions and had a bias against Darious based on his testimony that Darious had threatened his wife before trial.

colors, or was pictured on social media with gang members. However, "[a]lthough the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." *Allen v. State*, 315 Ga. 524, 529-530 (883 SE2d 746) (2023) (cleaned up). We conclude that the foregoing evidence, when viewed in the light most favorable to the verdicts, was sufficient to authorize the jury to conclude that Darious and Jujuane were associated with the Nine Trey Bloods. Moreover, in affirming Darious's and Jujuane's convictions for murder and other crimes committed against the individual victims, we have already concluded that the State proved that they committed predicate acts of violence. See OCGA § 16-15-3 (1) (J).

With regard to the contention that the State failed to prove that Darious and Jujuane intended to further the interests of the Nine Trey Bloods, the evidence showed that Darious, Jujuane, and their fellow gang members had engaged in a conflict for about a week with a rival gang and that, earlier on the day of the crimes, Darious and Jujuane were told that some of the rival gang members, who were

driving a gray car, were looking for them. Later that same day, Darious, Jujuane, and fellow gang members arrived at the gas station at almost exactly the same time, communicated with each other, and shot at the occupants of a gray car after Darious said "green light" or "go." Even though Darious, Jujuane, and their fellow gang members were mistaken that the occupants of the gray car were members of the Crips gang, the jury was nevertheless authorized to conclude that the shooting was undertaken with an intent to further the gang's interests. See *Monroe v. State*, 315 Ga. 767, 770-771 (884 SE2d 906) (2023) (holding that evidence that the defendant, acting with fellow gang members, "sought to avenge the perceived disrespectful behavior" of a rival gang member "was sufficient to establish a nexus between the charged crimes and an intent to further the gang's interests"). See also *Hayes v. State*, 298 Ga. 339, 342-343 (781 SE2d 777) (2016) (holding that evidence of a defendant's association with a criminal street gang and "his participation in the [gang's] activities before and during the crimes charged provide[d] the required nexus between his criminal acts and

the intent to further the gang's interests").

4. Muse and Darious contend that the verdicts were "contrary to [the] evidence and the principles of justice and equity," OCGA § 5-5-20, and "decidedly and strongly against the weight of the evidence," OCGA § 5-5-21. "Grounds for a new trial under these Code sections are commonly known as the 'general grounds,' and the two statutes give the trial court broad discretion to sit as a thirteenth juror and weigh the evidence on a motion for new trial alleging these general grounds." *Allen*, 315 Ga. at 531 n.5 (cleaned up). "But as an appellate court, we do not independently review the record as a thirteenth juror. The decision to grant or refuse to grant a new trial on the general grounds is vested solely in the trial court." *Ward v. State*, 316 Ga. 295, 299 (888 SE2d 75) (2023 WL 3468140, at *4) (May 16, 2023) (cleaned up). Here, in denying Muse's and Darious's motions for new trial, the trial court found that "the jury's guilty verdict was not 'contrary to [the] evidence and the principles of justice and equity.' OCGA § 5-5-20. Nor was the verdict 'decidedly and strongly against the weight of the evidence.' OCGA § 5-5-21."

32

The court also stated that it had "exercised its discretion and independently weighed the evidence in ruling on the merits of [Muse's and Darious's] OCGA §§ 5-5-20 and 5-5-21 claims," and that its "conscience approves this verdict." The record therefore shows that the trial court properly exercised its authority in refusing to grant a new trial on the general grounds. "Once we have determined that the trial court properly exercised its authority in refusing to grant a new trial on the general grounds, we cannot review the merits of that decision by the trial court." *Allen*, 315 Ga. at 531 (cleaned up). Accordingly, Muse's and Darious's claims on the general grounds fail.[6]

---

[6] In another case decided today, we noted that, "in the past, in evaluating a trial court's denial of a motion for new trial on the general grounds, see OCGA §§ 5-5-20 and 5-5-21, we have performed or referenced a constitutional due process sufficiency-of-the-evidence review under *Jackson* [*v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979)]." *King v. State*, 316 Ga. 611, 616 n.8 (889 SE2d 851) (2023). We also said in *King* that "many of us question whether it is proper for this Court to import *Jackson* into an appellate review of the general grounds (or to otherwise rely on *Jackson* as part of that analysis)." Id. However, we did not "determine the propriety of that practice" in *King* given that "King's general grounds claim fail[ed] in all events because the trial court exercised its discretion as the thirteenth juror, and because the evidence against King was constitutionally sufficient to affirm his convictions." Id. Similarly, here, where the trial court exercised its discretion as the thirteenth

5. All three Appellants contend that the trial court violated their Sixth Amendment right to counsel by failing to inform counsel of three jury notes and by failing to seek comment from counsel. Moreover, Muse and Darious contend that the trial court violated their right to be present under the Georgia Constitution by discussing those jury notes in their absence. We disagree with both of these contentions.

(a) The record shows that, during deliberations, the jury sent three notes to the trial court. In the first note, marked as "Court's Exhibit 1," the jury asked three questions: "Definitions of all charges?"; "Does the actual killing weapon need to be possessed by the said person to be found guilty of murder?"; and "Watch surveillance footage." The trial court said that the jury and the defendants "need[ed] to be brought" into the courtroom. Shortly thereafter, the record indicates that the jury was brought into the courtroom. The record is silent as to whether Appellants were

juror and where we have rejected Appellants' claims under *Jackson v. Virginia*, we also need not "determine the propriety of that practice." Id.

34

brought into the courtroom. In the presence of counsel, the court asked the jurors what they meant by "[t]he definition for all charges," and the foreperson said that "[t]here was a specific list you read that kind of broke down and clarified the charges." The court asked whether the jury had been provided written charges, and the prosecutor noted that the court had asked the prosecutor and defense counsel to redact the charges that the court had marked through before giving the written charges to the jury and that counsel would be finished in about ten minutes with that task. Counsel for Jujuane agreed with the prosecutor's comment, saying "[t]hat's correct." The court then informed the jury that it would have those charges shortly.

As for the second question, the court at one point said that the question was, "Do you have to be holding the gun to be convicted of murder?" Shortly thereafter, the court said that the question was, "Does the actual killing weapon need to be possessed by said person to murder to be found guilty of?" The trial court did not ask counsel what they thought was the appropriate response to the question.

Instead, the court instructed the jury that the answer to the question was "no," but that it would have the written charges and needed to review them. With regard to the third question, the court, the prosecutor, and counsel for Appellants had an extensive discussion regarding whether the jury could watch the surveillance footage in the jury room or had to watch it in the courtroom. Appellants contended that permitting the jury to watch the footage in the jury room would violate the continuing witness rule, but the court overruled the objection.

The record also contains a second note from the jury, marked as "Court's Exhibit 2." That note contained a question asking if the jury could review the transcript of McKenzie's trial testimony. The exhibit contains a written answer from the trial court: "No. Not available. Need to remember testimony as best you can." The trial transcript contains no mention of this note by the trial court to counsel.

In yet a third note, marked "Court's Exhibit 3," the jury asked the court, "If we can come to agreement on some charges, but not

others, for one defendant, how does that impact our decision?" The trial court read the note to counsel and asked, "How do I respond to that?" All counsel voiced their thoughts, and with the agreement of all counsel, the trial court instructed the jury that "[i]t's the hope that you can have unanimous agreement on every single charge. If it comes to the point where you find that that's impossible, then you need to let me know."

At joint hearings on Appellants' motions for new trial, the trial court heard testimony regarding whether counsel and Appellants were present when the notes were discussed. The lead and assistant prosecutors both testified that the trial judge discussed the jury questions in the presence of all counsel and defendants, including the question regarding McKenzie's testimony. They also added that the trial judge's practice was always to discuss jury questions with counsel and the defendants being present. Moreover, Muse's trial counsel testified that the trial judge's practice was to discuss jury questions with counsel and defendants; that he had no reason to believe that the judge did not follow that practice in this case; that

he remembered discussing jury questions with the court; that Muse was with him during the discussions; that he had no reason to think that other defendants and defense counsel were not present; and that if somebody had been missing during discussions, defense counsel would have raised their absence with the trial court, saying "[t]hat is just standard practice." Jujuane's trial counsel testified that she did not have "any specific recollection to conversations about the jury questions," but that she was "sure" that the trial court included her and her client when discussing the jury questions because that was the court's normal practice. Reiterating that she had no specific recollection of the discussions about the jury questions, she added that to the best of her memory and based on the court's normal practice, "the judge would read us the question and ask us if we have any input to tell us what it is." She also testified that she was "able to participate in those conferences"; that her "client [was] with [her]"; that "other defense counsel were there"; and that if any defense counsel or defendants had been missing, she would have raised the issue with the trial court.

In denying Appellants' motions for new trial, the trial court found that Appellants had "failed to sufficiently demonstrate from the full record of this case—including the record made at the hearing on . . . motion for new trial—that [Appellants] and [their] lawyer[s] were . . . precluded from discussing the jury questions with the trial court or . . . excluded from a colloquy between the trial court and the jury."

(b)   "A criminal defendant's constitutional right to counsel attaches after the onset of formal prosecutorial proceedings and continues through all critical stages of the proceeding brought against him."  *Lowery v. State*, 282 Ga. 68, 74-75 (646 SE2d 67) (2007) (citations omitted).[7] In *Lowery*, we said that:

> Assuming without deciding that the right to counsel encompasses the right to have reasonable notice of a deliberating jury's substantive communication and a meaningful opportunity to be heard with regard to the

---

[7] Appellants do not cite to either the Georgia or the United States Constitution to support their right-to-counsel claim. Instead, they rely primarily on *Lowery*, in which we held that a violation of the Sixth Amendment right to counsel constituted harmless error. Accordingly, we analyze Appellant's claims as asserting a violation of the Sixth Amendment right to counsel and not as asserting a violation of the right to counsel under the Georgia Constitution. See Ga. Const. of 1983, Art. I, Sec. I, Par. XIV.

proposed response thereto, the failure of the trial court to inform counsel of the contents of the note and to seek comment on or input in the formulation of the court's response would constitute a violation of the right to counsel.

Id. at 75 (footnote omitted). Furthermore, "[i]n an exercise of this Court's inherent power to maintain a court system capable of providing for the administration of justice in an orderly and efficient manner," we took the opportunity to announce a rule requiring

> trial courts to have jurors' communications submitted to the court in writing; to mark the written communication as a court exhibit in the presence of counsel; to afford counsel a full opportunity to suggest an appropriate response; and to make counsel aware of the substance of the trial court's intended response in order that counsel may seek whatever modifications counsel deems appropriate before the jury is exposed to the instruction.

Id. at 76. Since we decided *Lowery*, we have not revisited the existence of the constitutional rule that we assumed in *Lowery*–that a defendant's right to counsel "encompasses the right to have reasonable notice of a deliberating jury's substantive communication and a meaningful opportunity to be heard with

regard to the proposed response thereto." Id. at 75.[8] The Court of Appeals, however, has said that in *Lowery*, we held that "'the failure of the trial court to inform counsel of the contents of [a jury note] and to seek comment or input in the formulation of the court's response [constitutes] a violation of [a defendant's] right to counsel.'" *Dowda v. State*, 341 Ga. App. 295, 299 (799 SE2d 807) (2017) (alterations in original). Appellants rely on *Lowery* and *Dowda* to argue that the trial court violated their right to counsel in this case. Assuming without deciding the continued validity of the constitutional rule that we assumed in *Lowery*, we conclude that Appellants' claim fails.

(c) As for the merits of the right-to-counsel claim, the record shows that the trial court complied with the requirements of *Lowery* when addressing the jury notes regarding the definitions of the jury

---

[8] We have, however, had an opportunity to address the new rule of procedure that we announced in *Lowery* for handling jury communications. See *Styles v. State*, 309 Ga. 463, 469 n.6 (847 SE2d 325) (2020) (holding that any error in failing to comply with *Lowery*'s procedural rule was harmless and saying that "[s]ome of us have questions as to the propriety of our unilateral pronouncement of a new rule of procedure in *Lowery*, rather than through the rule-making process established by the Georgia Constitution").

charges, watching the surveillance footage, and what would happen if the jury could not reach agreement on some of the charges against Appellants. The trial court, however, failed to afford Appellants' counsel an opportunity to provide input on the question regarding whether a defendant needed to possess the murder weapon to be found guilty. Moreover, the trial record does not show that the trial court afforded counsel an opportunity to provide input on the question whether the jury could review the transcript of McKenzie's testimony, and for purposes of appeal, we will assume that the testimony at the hearings on motion for new trial did not resolve the issue. However, we conclude that any violation of Appellants' right to counsel on these two questions was harmless.

As we explained in *Lowery*, an error of constitutional magnitude, such as the denial of the Sixth Amendment right to counsel, can be harmless if "the State can prove beyond a reasonable doubt that the error did not contribute to the verdict." *Lowery*, 282 Ga. at 75 (cleaned up). There, the Court held that the trial court erred when it failed to inform counsel of the contents of a jury note

on its deadlocked status before the trial court responded to the note by giving an *Allen* charge. Id. at 74-75. We concluded that the constitutional error was harmless beyond a reasonable doubt, explaining that "[t]he decision to give an *Allen* charge is within the trial court's discretion" and that, as we had explained earlier in the opinion, "the *Allen* charge given by the trial court, though inaccurate, did not constitute reversible error." Id. at 75.

Here, we also conclude that any violation of Appellants' right to counsel was harmless beyond a reasonable doubt. First, the trial court's response that a defendant did not have to be in possession of the murder weapon to be found guilty of murder was an accurate statement of the law and was adjusted to the evidence in the case. See *Kemp v. State*, 303 Ga. 385, 390 (810 SE2d 515) (2018) (holding that the defendant did not have to be in possession of the murder weapon to be found guilty of murder where the evidence showed that the defendant conspired with others to rob the victim); *Morris v. State*, 308 Ga. 520, 529 (842 SE2d 45) (2020) ("A jury instruction must be adjusted to the evidence and embody a correct, applicable,

43

and complete statement of law." (cleaned up)). Moreover, "[w]hether or not to grant the jury's request to rehear portions of the evidence is within the discretion of the trial judge." *Smith v. State*, 280 Ga. 161, 162 (625 SE2d 766) (2006) (cleaned up). "In fact, we have long held that, in Georgia, a judgment will not be reversed because the trial court declines to aid the jury in recalling the evidence and refuses a request to have certain testimony read back." *Johnson v. State*, 301 Ga. 205, 208 (800 SE2d 296) (2017) (cleaned up). Thus, the trial court did not abuse its discretion in refusing to permit the jury to review a transcript of McKenzie's testimony.[9] Accordingly, we conclude that any error by the trial court in failing to consult with defense counsel before providing the jury with answers to the two questions at issue was harmless beyond a reasonable doubt. See *Lowery*, 282 Ga. at 75.

---

[9] At the motion for new trial hearing, Jujuane's counsel testified that, if the trial court had asked her how she would have responded to the jury's note about reviewing a transcript of McKenzie's testimony, she would have told the trial court to tell the jurors to rely on their memory.

44

(d) With regard to Muse's and Darious's contention that the trial court violated their right to be present by discussing jury notes in their absence, the record belies this claim. To begin, the trial court directed that Appellants be brought into the courtroom before it addressed the notes from the jury, and "[w]e must apply the presumption of regularity and conclude that the trial court conducted the trial properly by making sure appellant[s] w[ere] present when necessary." *Milinavicius v. State*, 290 Ga. 374, 377 (721 SE2d 843) (2012) (holding, based on the presumption of regularity, that when the record failed to show that the defendant was present for a discussion about replacing a juror, but showed that the court had directed before the discussion that the defendant be brought into the courtroom, there was no violation of the defendant's right to be present).

In addition, the record, including the testimony at the motion for new trial hearings, supports the trial court's conclusion in denying Appellants' motions for new trial that Appellants were present for the discussions regarding the jury notes. In this regard,

45

the prosecutors testified, among other things, that the trial judge discussed the jury questions in the presence of all counsel and defendants and that his normal practice was to do so. Moreover, Muse's trial counsel testified that the trial judge's practice was to discuss jury questions with counsel and defendants; that he had no reason to believe that the judge did not follow that practice in this case; and that he remembered Muse being with him when discussing jury questions with the court. And Jujuane's trial counsel testified, among other things, that she was "sure" that the trial court included her and her client when discussing the jury questions and that it was the court's normal practice to do so. Based on this evidence, we conclude that the trial court did not err in concluding that Appellants had failed to show that they were excluded from the discussions regarding the jury notes. See *Frezghi v. State*, 273 Ga. 871, 871 (548 SE2d 296) (2001) (concluding that where both prosecutors testified at the hearing on the motion for new trial that the defendant was present for a portion of voir dire held in chambers, the trial court did not err in ruling against the

defendant's claim that the court violated his right to be present by excluding him from that portion).

6. Appellants all contend that the trial court violated the continuing witness rule by allowing the jury to watch the surveillance videos in the jury room. "However, the continuing witness rule is directed at written testimony that is heard by the jury when read from the witness stand." *Moore*, 311 Ga. at 511. "The rule is based on the principle that it is unfair and places undue emphasis on written testimony that has been read to the jury for the writing to be sent out with the jury to be read again during deliberations whereas oral testimony is received by the jury only once." Id. at 511-512. Here, the surveillance videos were "not the reduction to writing of an oral statement, nor a written statement provided in lieu of testimony." *Clarke v. State*, 308 Ga. 630, 636 (842 SE2d 863) (2020) (cleaned up). Instead, they were "original documentary evidence," they "did not derive their evidentiary value solely from the credibility of their makers," and they were "properly allowed to go out with the jury." Id. (cleaned up). Accordingly, the

47

trial court did not err in overruling Appellants' continuing witness objection. See id. at 637. Accord *Moore*, 311 Ga. at 511-512 (holding that the continuing witness rule did not apply to a computer presentation prepared by a detective that summarized cell phone records that had been admitted into evidence); *Clarke*, 308 Ga. at 636-637 (holding that the continuing witness rule did not apply to a printout of text messages that the defendant had sent to the victim and which had been read to the jury during trial); *Windhom v. State*, 326 Ga. App. 212, 214-215 (756 SE2d 296) (2014) (holding that the trial court did not violate the continuing witness rule by allowing a surveillance video to go out with the jury, explaining that "unlike a videotaped interview or a transcript of testimony, the video recording . . . is independent and original evidence, in and of itself, and does not depend on the credibility of the maker for its value" (cleaned up)).[10]

---

[10] Appellants rely on *Lyons v. State*, 309 Ga. 15, 17-19 (843 SE2d 825) (2020), to claim that the trial court erred in permitting the jury to re-watch the video surveillance footage in the jury room. *Lyons*, however, is inapplicable. There, the defendant contended that the trial court violated the continuing

48

7. Muse and Darious contend that the State failed to timely provide discovery of evidence of text messages and other data extracted during the "phone dump" of Muse's cell phone by Investigator Watkins.[11] See OCGA § 17-16-4 (a) (3) (A). As a result, they contend, the trial court erred by failing to exclude the evidence and by failing to grant their motions for mistrial.

Two days after Watkins testified about the data extracted from Muse's cell phone, Appellants contended that they had not been provided this information as part of discovery and that the discovery violation meant that they had been unable to prepare for Watkins's

_____

witness rule by permitting the jury to re-read two witnesses' written statements to police, re-watch a video-recording of a witness's statement to police, and re-watch a surveillance video from an apartment complex. We did not address whether the surveillance video was subject to the rule, but decided the case simply on the ground that the rule was not violated because the jury viewed all the evidence in the courtroom and not in the jury room. *Lyons* therefore cannot be read as standing for the proposition that surveillance videos are subject to the continuing witness rule. See *Palmer v. State*, 282 Ga. 466, 468 (651 SE2d 86) (2007) ("[D]ecisions of this Court do not stand for points that were neither raised by the parties nor actually decided in the resulting opinion," and "questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (cleaned up)).

[11] In denying Muse's and Darious's motions for new trial, the trial court found that the State did comply with discovery requirements for this evidence. Muse and Darious disagree with this finding, but we need not resolve the disagreement to decide this appeal.

49

testimony and had made the trial unfair, entitling them to a mistrial. They also moved to exclude the evidence based on the discovery violation. The trial court denied both motions and granted Appellants a continuance in order for Appellants to have an opportunity to review the cell phone evidence.

With regard to Muse's and Darious's mistrial motion, because the record shows that they did not move for a mistrial until two days after the testimony in question, the mistrial issue is not preserved for appellate review. See *Bedford v. State*, 311 Ga. 329, 332-333 (857 SE2d 708) (2021) (holding that because the defendants "moved for a mistrial after, not contemporaneously with, the State's improper closing argument, the motion was untimely and the issue was not preserved for appellate review"), disapproved in part on other grounds by *Clark*, 315 Ga. at 435 n.16.

With regard to Muse and Darious's claim that the trial court should have excluded evidence of the "phone dump" because of a discovery violation, they likewise did not timely raise this issue at trial, waiting two days after Watkins's testimony to do so.

50

Accordingly, we review this claim for plain error. See OCGA § 24-1-103 (d).[12] To show plain error, Appellants

> must point to an error that was not affirmatively waived, the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have seriously affected the fairness, integrity, or public reputation of judicial proceedings.

*Grier v. State*, 313 Ga. 236, 240-241 (869 SE2d 423) (2022) (cleaned up).

OCGA § 17-16-4 (a) (3) (A) required the State, as it concedes, to permit Muse and Darious to inspect and copy the data extracted from Muse's cell phone "no later than ten days prior to trial, or as otherwise ordered by the court." "OCGA § 17-16-6 provides that if the ten-day deadline is not met, the trial court can elect various remedies short of exclusion, including granting a continuance." *Harris v. State*, 313 Ga. 653, 666 (872 SE2d 732) (2022). Moreover, "[t]he State may be prohibited from introducing evidence that was

---

[12] We assume without deciding that the trial court's refusal to exclude the evidence of the cell phone data is subject to plain error review under OCGA § 24-1-103 (d).

not timely disclosed only upon a showing of both prejudice to the defendant and bad faith by the State." Id. (cleaned up). We review a trial court's decision under OCGA § 17-16-6 for an abuse of discretion. See *Wyatt v. State*, 300 Ga. 509, 511 (796 SE2d 701) (2017).

Muse and Darious have not shown clear error because they have not shown that if they had timely objected to the lack of proper notice, the exclusion of the evidence would have been required. Here, when Muse and Darious made their untimely objection, they did not make any argument, or offer any evidence showing, that the prosecution had acted in bad faith in failing to provide timely notice of the cell phone data. Moreover, the trial court granted them a continuance from 10:00 a.m. Friday until trial reconvened on Monday. That Friday morning, the prosecutor provided defense counsel with the cell phone data, and the trial court informed defense counsel that, on Monday, they could present any evidence regarding the data that they needed to. When the trial reconvened on Monday, Muse and Darious did not claim that they had an

inadequate amount of time to review Muse's cell phone data. Under these circumstances, we cannot conclude that if Muse and Darious had made a timely objection, the trial court would have excluded the evidence instead of granting a continuance or fashioning some other remedy, as permitted by OCGA § 17-16-6. Muse and Darious therefore have not satisfied their burden to show clear error. See *Grier*, 313 Ga. at 242-243 (holding that, under plain error review, the defendant failed to show clear error for lack of timely notice regarding a witness's testimony because the exclusion of the witness's testimony would not have been required had the defendant made a timely objection given that "absent a showing of prejudice to the defendant and bad faith by the State, the ordinary remedy for failure to comply with a requirement that a witness must be identified prior to trial is simply a continuance to allow for an interview of the witness" and given that "we assume that the trial court would have followed the law if an objection to notice had been made").

8. In their motions for new trial, Muse and Darious claimed that they were entitled to a new trial on the ground that the State violated their due process rights under *Brady v. Maryland*, 373 U.S. 83 (83 SCt 1194, 10 LE2d 215) (1963), by failing to disclose before trial evidence of the text messages and other data extracted from Muse's cell phone. The trial court rejected these claims, and on appeal, Muse and Darious contend that the trial court erred in doing so. We disagree.

To prevail on their *Brady* claims, Muse and Darious must show that

> (1) the State possessed evidence favorable to [their] defense; (2) [they] did not possess the favorable evidence and could not obtain it [themselves] with any reasonable diligence; (3) the State suppressed the favorable evidence; and (4) had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the trial would have been different.

*Harris*, 313 Ga. at 664 (cleaned up). "The burden of proof on these elements lies with the defendant." Id. "To establish the fourth prong, often referred to as materiality, a defendant does not need to show that he necessarily would have been acquitted, but only that

54

the State's evidentiary suppression undermines confidence in the outcome of the trial." *Anglin v. State*, 312 Ga. 503, 510 (863 SE2d 148) (2021) (cleaned up). Moreover, "[i]n the case of an untimely disclosure, a defendant must show that an earlier disclosure would have benefited the defense and that the delayed disclosure deprived him of a fair trial" or "materially prejudiced his defense." Id. at 510-511 (cleaned up). "On appeal, we review a trial court's factual findings regarding a *Brady* claim for clear error but review de novo the court's application of the law to the facts." *Downer v. State*, 314 Ga. 617, 633 (878 SE2d 537) (2022).

As for Muse's *Brady* claim, the trial court denied it, ruling that Muse "made no showing that the cellphone extraction was favorable to his case." On appeal, Muse does not point to any data extracted from his phone that he contends was exculpatory, and we conclude that Muse has failed to carry his burden to show that the evidence was exculpatory. In fact, the messages to which Investigator Watkins testified were highly inculpatory, showing Muse's involvement with the Nine Trey Bloods and his concern, shortly

after the crimes, with moving "that stick," with the news, and with "7/62 by 39" ammunition. Accordingly, we conclude that Muse's *Brady* claim is without merit. See *Hall v. State*, 286 Ga. 358, 360-361 (687 SE2d 819) (2010) (holding that the defendant's *Brady* claim was without merit because he failed to show that the State possessed evidence favorable to him).

With regard to Darious's *Brady* claim, the trial court noted that the cell phone extraction contained information favorable to Darious in that his name was not found on Muse's phone. It ruled, however, that, even assuming that the evidence was not disclosed pretrial but only during trial, Darious had not shown that the delayed disclosure deprived him of a fair trial because Darious used the "favorable information [from the cell phone extraction]—i.e., his absence from Muse's cellphone data—to distance himself from Muse . . . at trial." We conclude that the trial court did not err.

At trial, after Appellants claimed that they had not received the information extracted from Muse's phone before trial, the trial court granted a continuance from 10:00 a.m. Friday until trial

56

reconvened on Monday. The trial court also informed defense counsel that, on Monday, they could present any evidence regarding the "phone dump" that they needed to. That Monday, Appellants did not present any evidence regarding Muse's phone records. But, in closing argument, Darious's counsel noted that the State had presented "a ton of phone records for Durell Muse," and argued that "[t]here's no indication my client knew Durell Muse . . . . No indication at all. Diablo does not appear on his contacts list. Darious Harris doesn't appear on his contacts list. Darious Harris's face does not appear in any of the videos that you were presented."

On appeal, Darious contends that the exculpatory evidence from the "phone dump" was that "the phone records did not include any reference to [him]." As the foregoing discussion of closing arguments shows, Darious highlighted the relevant exculpatory evidence for the jury in closing. Accordingly, we conclude that Darious has failed to carry his burden to show that any delayed disclosure "materially prejudiced him or deprived him of a fair trial." *Anglin*, 312 Ga. at 512-513 (holding that the defendant's claim that

57

the delayed disclosure of certain evidence violated *Brady* was without merit because the defendant was able to establish the point that he wanted to make with that evidence through the use of other evidence and therefore "failed to establish that the delayed disclosure materially prejudiced him or deprived him of a fair trial").

9. Darious contends that the State violated OCGA § 17-16-8 and his due process rights by failing to disclose McKenzie as a witness at least ten days before trial[13] and that the trial court abused its discretion by failing to exclude McKenzie's testimony. We disagree.

(a) We have stated that the requirements of OCGA § 17-16-8 (a) are

> designed to prevent a defendant from being surprised at
> trial by a witness that the defendant has not had an

---

[13] OCGA § 17-16-8 (a) provides:

> The prosecuting attorney, not later than ten days before trial, . . . shall furnish to the opposing counsel . . . the names, current locations, dates of birth, and telephone numbers of that party's witnesses, unless for good cause the judge allows an exception to this requirement, in which event the counsel shall be afforded an opportunity to interview such witnesses prior to the witnesses being called to testify.

opportunity to interview. Moreover, the trial court may allow an exception to the rule where good cause is shown and counsel is afforded an opportunity to interview the witness.

*Hines v. State*, 313 Ga. 1, 4 (867 SE2d 85) (2021) (cleaned up). Here, the trial court determined that the State had established good cause for not complying with the statutory requirements and ensured that Darious was given an opportunity to interview McKenzie. On the third day of trial, just before the State was going to call McKenzie to testify, Jujuane objected to him testifying, stating that the State had not timely disclosed McKenzie as a witness.[14] Jujuane argued that the late notice did not comply with discovery requirements and that the trial court should exclude his testimony. In response, the prosecutor stated that she had only discovered McKenzie as a witness the same week that she had provided his name and birth date to defense counsel and that she had provided that information

---

[14] Darious did not specifically join in Jujuane's objection. However, at the beginning of trial, Darious's counsel stated that when one of defense counsel objected, the others would all adopt the objection unless it was separately noted for the record. The trial court responded, "All right." The State does not contend that Darious failed to preserve this issue for appeal, and we assume for purposes of this appeal that the issue was properly preserved.

ten days before trial. Defense counsel did not dispute that the State had only discovered McKenzie shortly before trial, but contended that the notice of McKenzie as a witness was provided just ten days before he was called as a witness at trial and that the State had not provided his phone number and address, as required by OCGA § 17-16-8 (a).[15] The record also shows that Darious was afforded the opportunity to interview McKenzie before he was called as a witness, but that McKenzie declined to be interviewed. The trial court denied the motion to exclude McKenzie from testifying, noting that defense counsel had been given an opportunity to interview him. Also, as a condition for permitting McKenzie to testify, the trial court required the State to provide defense counsel with a printout of McKenzie's criminal history, which the State did. Under these circumstances, we conclude that the trial court did not abuse its discretion in allowing an exception to the requirements of OCGA § 17-16-8 (a).

---

[15] In its order denying Darious's motion for new trial, the trial court found that McKenzie's name was not provided as a witness at least ten days before trial, but ruled against Darious's claim that the court had erred in permitting McKenzie to testify.

See *Hines*, 313 Ga. at 2-4 (holding that the trial court did not abuse its discretion in determining that there was good cause for a late-disclosed witness to testify where the prosecutor told the court on the morning of the first day of trial that he had only that morning become aware of the witness's name and contact information and had given defense counsel an opportunity to speak with the witness); *Norris v. State*, 289 Ga. 154, 157 (709 SE2d 792) (2011) (holding that the trial court did not abuse its discretion in denying a continuance for the State's late disclosure of certain witnesses in part because, even though the witnesses "declined an interview, as was their prerogative," the defendant had been given the opportunity to interview them (cleaned up)).

(b) Darious also contends that the untimely disclosure of McKenzie as a witness violated due process but this claim was not raised at trial, and we therefore review it only for plain error. See OCGA § 24-1-103 (d). Darious's sole argument on this point is that "[t]he untimely disclosure was a due process violation. *Smith v.*

61

*Estelle*, 602 F2d 694 (5th Cir. 1979)."[16] *Smith*, however, involved considerations unique to the penalty phase of a death penalty trial and is easily distinguishable from this case. There, the State failed to disclose that a psychiatrist who had interviewed the defendant before trial would appear as a witness at the death penalty phase of the defendant's trial. The trial court permitted the psychiatrist to testify, and he gave damaging testimony about the defendant's future dangerousness. See id. at 696-697. The Fifth Circuit held that permitting the psychiatrist to testify violated due process, explaining that the "informality and relaxed procedures" that permitted the testimony could not "possibly outweigh the risk that the state may execute a person who would not have been sentenced to death if the jury had had full and accurate sentencing information[,] an indispensable prerequisite to a reasonable determination of whether a defendant shall live or die." Id. at 702

---

[16] Darious does not cite to either the Georgia or the United States Constitution to support this due process claim, but simply cites to the *Smith* case. Because that case involved a claim under the United States Constitution, we do not analyze Darious's claim under the Georgia Constitution's Due Process Clause. See Ga. Const. of 1983, Art. I, Sec. I, Par. I.

(cleaned up).[17]

Darious fails to acknowledge that "[t]here is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (97 SCt 837, 51 LE2d 30) (1977). Accord *Bello v. State,* 300 Ga. 682, 683 (797 SE2d 882) (2017) (quoting *Weatherford* for that proposition). In *Weatherford,* the defendant argued that due process required the prosecution to disclose before trial the names of witnesses who would testify against him and prohibited the prosecutor from presenting at trial the surprise testimony of an undercover agent. See id. The Court in *Weatherford* rejected that argument. See id. at 559-561. We have held, however, that due process may require that the accused upon timely request be afforded a meaningful opportunity to have "critical evidence whose nature is subject to varying expert opinion" examined by his own lawyers and experts before trial. *Sabel v. State*, 248 Ga. 10, 18 (282 SE2d 61) (1981) (holding that due process demanded that the

---

[17] The decision of the Fifth Circuit was affirmed on other grounds by the United States Supreme Court. See *Estelle v. Smith*, 451 U.S. 454, 462 (101 SCt 1866, 68 LE2d 359) (1981).

accused be afforded an opportunity to have paint samples that were subject to varying expert opinions examined by an expert of his choosing). Accord *Reaves v. State*, 284 Ga. 181, 190 (664 SE2d 211) (2008) (explaining that the defendant was not "entitled to have an expert examine evidence such as a tape recording unless it constitutes critical evidence whose nature is subject to varying expert opinion" (cleaned up)).  Here, however, because McKenzie's testimony did not involve "critical evidence whose nature is subject to varying expert opinion," *Sabel*, 248 Ga. at 18, the due process principles of *Sabel* do not apply.

In sum, Darious has pointed to no controlling authority holding that due process required the State to disclose McKenzie as a witness before trial. He has therefore failed to carry his burden to show clear error. See *Williams v. State*, 316 Ga. 304, 308 (888 SE2d 60) (2023) ("As to the second part of the [plain error] test, an error is plain if it is clear or obvious under current law. An error cannot be plain where there is no controlling authority on point or if a defendant's theory requires the extension of precedent." (cleaned

64

up)); *Grier*, 313 Ga. at 240-241 (holding that under the second part of the plain error test, a defendant must point to an error that is "clear and not open to reasonable dispute" (cleaned up)); *Ash v. State*, 312 Ga. 771, 794-795 (865 SE2d 150) (2021) (holding that the trial court's failure to give a portion of a jury instruction was not plain error, in part, because the defendant "has pointed to no precedent holding that the omission of this sentence from the pattern instruction constitutes error under these circumstances.").

10. Darious and Jujuane contend that the trial court erred in denying their motions to sever their trials from their co-defendants and each other. We disagree.

"In a murder case where the death penalty is not sought, the trial court has broad discretion to grant or deny a motion for severance." *Hurston v. State*, 310 Ga. 818, 825 (854 SE2d 745) (2021).

> In ruling on a motion to sever, a trial court should consider: (1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one defendant may be considered against the other defendant; and (3) the presence or absence of antagonistic defenses.

*Collins v. State*, 312 Ga. 727, 735 (864 SE2d 85) (2021) (cleaned up). "When claiming on appeal that a trial court abused its discretion in denying a severance motion, a defendant must do more than show the presence of antagonistic defenses or possibility that a separate trial would give a defendant a better chance of acquittal." *Sillah*, 315 Ga. at 750 (cleaned up). Rather, "[t]he defendant must make a clear showing that the joint trial was so prejudicial as to amount to a denial of his right to due process." Id. (cleaned up).

Darious and Jujuane both argue that there was a likelihood of confusion of the evidence and that prejudicial gang evidence against Rosenau and Muse spilled over to them. In this vein, Jujuane also argues that the evidence against his co-defendants was more substantial than the evidence against him, pointing to the lack of evidence that he possessed a firearm.

With regard to whether the jury might have become confused regarding the evidence, we have concluded it is unlikely that a jury would confuse the evidence where, as here, co-defendants are

66

"charged with the same offenses stemming from the same incident with largely the same evidence; the jury was instructed to determine guilt or innocence of each defendant separately; the jury returned a separate verdict for each defendant; and the jury was instructed on mere association, mere presence, and parties to a crime." *Draughn v. State*, 311 Ga. 378, 386-387 (858 SE2d 8) (2021). Moreover, "the fact that the evidence as to one of the co-defendants is stronger does not demand a finding that the denial of a severance motion is an abuse of discretion, where there is evidence showing that the defendants acted in concert." *Smith v. State*, 308 Ga. 81, 86-87 (839 SE2d 630) (2020) (cleaned up).

As for Jujuane's contention that he should not have stood trial with the other three co-defendants because the State did not offer evidence that he possessed a firearm and was a shooter, we have concluded that this factor does not require severance where the State presents evidence, as here, that "co-defendants acted in concert," making it unnecessary "under the applicable law on party to a crime to show that any specific co-defendant physically

67

possessed a weapon for that defendant to be convicted." *Smith*, 308 Ga. at 86. With regard to Darious's and Jujuane's claim that gang evidence relating to Muse and Rosenau spilled over to them, we note that McKenzie and Sergeant Gaither testified that Darious and Jujuane were members of the Bloods gang, and some evidence of Rosenau's and Muse's gang membership would likely have been admissible against Jujuane in a separate trial given that the State's theory under the street gang count was that members of the Bloods gang acted in concert to attack members of the Crips gang over a dispute. See *Saylor*, 316 Ga. at 231 (holding that gang evidence against two co-defendants did not warrant a severance as some evidence regarding those co-defendant's gang activity would likely have been admissible in a separate trial based on the State's theory on the gang count of the indictment that the defendants acted in concert as gang members and as "there is no clear showing that this evidence prejudiced [the defendant] given the evidence of [his] gang membership").

Moreover, Darious and Jujuane have not shown that their co-defendants' defenses were antagonistic to theirs. Darious and Jujuane both acknowledged that they were at the crime scene and that they knew members of the Bloods gang, but claimed that they did not participate in any plan to commit the crimes and did not shoot at members of the Crips gang. Darious and Jujuane did not implicate each other in the crimes. Muse, meanwhile, admitted being a member of the Bloods gang, but denied being present at the crime scene and did not implicate Darious and Jujuane as being members of the Bloods or as being participants in the shooting. Forehand's defense, like those of Darious and Jujuane, was that she was present at the crime scene but that she did not participate in or plan the shooting. Like Muse, Forehand did not testify that she saw Darious or Jujuane shoot at anyone. See *Young v. State*, 315 Ga. 208, 213 (881 SE2d 689) (2022) (holding that the defendants "did not raise antagonistic defenses, such as each one saying the other shot [the victim]"). Finally, Darious and Jujuane have not shown how any potential antagonistic defenses prejudiced their trials. See *Krause v.*

69

*State*, 286 Ga. 745, 750 (691 SE2d 211) (2010) ("[U]nless there is a showing of resulting prejudice, antagonistic defenses do not automatically require a severance." (quoting *Green v. State*, 274 Ga. 686, 688 (558 SE2d 707) (2002))).

For the foregoing reasons, we conclude that Darious and Jujuane have failed to make the clear showing that being tried with their co-defendants and each other was so prejudicial as to amount to a denial of due process.

11. Muse contends that his trial counsel was constitutionally ineffective in failing to object to hearsay testimony by Davis regarding statements that Bell made at the crime scene to a law enforcement officer and later to her. Even assuming that counsel did fail to object to Davis's testimony, we disagree.

To establish that his trial counsel was constitutionally ineffective, Muse was required to prove both deficient performance by counsel and resulting prejudice. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To show that his lawyer's performance was deficient, Muse had to demonstrate

70

that the lawyer performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. at 687-688. The law recognizes a "strong presumption" that counsel performed reasonably, and the defendant bears the burden of overcoming this presumption. Id. at 689. To carry this burden, Muse must show that "no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." *Washington v. State*, 313 Ga. 771, 773 (873 SE2d 132) (2022) (quoting *Davis v. State*, 299 Ga. 180, 183 (787 SE2d 221) (2016)). Even when a defendant has proved that his counsel's performance was deficient, he also must prove resulting prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Moreover, "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.

We pretermit whether trial counsel performed deficiently in failing to make hearsay objections to Davis's testimony, as Muse cannot show the requisite prejudice. In this regard, Muse first contends that trial counsel should have objected to Davis's testimony that, on the night of the crimes, Bell gave the same account to law enforcement officers of what happened as she did.[18] Muse also contends that trial counsel performed deficiently in failing to object to Davis's testimony that she and Bell discussed whether he wanted to come to court to testify. Davis testified that Bell "didn't say [that he wanted to come] all of the time, but he was coming."[19] Muse contends that Davis's hearsay testimony added extra weight to the State's case and prejudiced his defense.

But, with regard to Davis's testimony that Bell's statement on the night of the crimes to law enforcement officers was the same as

---

[18] Davis did not testify about what she told law enforcement officers on the night of the crimes, but the parties agree that the State, with this question to Davis about Bell's statement on the night of the crimes, was attempting to establish that on the night of the crimes Bell told law enforcement officers that a bullet struck their car.

[19] On direct examination, Bell was asked by the State if he wanted "to come here today" to testify. Bell responded that he "would rather not, because [he] work[ed] at night."

hers, Davis unequivocally testified that a bullet struck the car in which she and Bell were riding, and Bell testified that he merely "assum[ed]" that a brick hit the car, that a bullet could have hit the windshield, and that he did not "know what the object was." In addition, Bell acknowledged that at the time an object hit their windshield, "a lot of shooting started" and that he ducked down, "went into defense mode," was "trying to get out of harm's way," and was "trying not to get shot." Finally, the jury heard evidence that 59 shots were fired that night, and the evidence showed that they were fired in the direction of Bell's car. Given this evidence, we conclude that Muse has failed to establish that, even if counsel had raised a hearsay objection and the trial court had excluded Davis's testimony about Bell's statement on the night of the crimes, there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. See *Payne v. State*, 314 Ga. 322, 330 (877 SE2d 202) (2022) (holding that even if counsel was ineffective in failing to object to hearsay evidence, the defendant failed to show prejudice

because the hearsay evidence was cumulative of other evidence admitted at trial).

In addition, Muse makes no specific argument about how Davis's testimony—that Bell said that he was reluctant to testify, but would nevertheless come to court and do so—was prejudicial. We conclude that Muse has failed to establish that, if counsel had objected to this testimony and the trial court had excluded it from evidence, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Finally, we conclude that the cumulative prejudice from the assumed deficiencies is insufficient to show a reasonable probability that the results of the proceedings would have been different in the absence of the alleged deficiencies. See *Jones v. State*, 305 Ga. 750, 757 (827 SE2d 879) (2019) (explaining that "the effect of prejudice resulting from counsel's deficient performance is viewed cumulatively").[20]

---

[20] In addition to the two assumed deficiencies on the part of Muse's trial counsel, we have concluded that the trial court made two errors regarding

74

12. Darious contends that he is entitled to a new trial because "the State now concedes that 'the record as it currently stands does not truly or fully disclose what transpired in the trial court.'" We disagree.

The "concession" to which Darious refers was made in a motion to reconstruct the record filed by the State before the second hearing on the motion for new trial. The motion alleged that the transcript did not accurately reflect the discussion between the court and counsel regarding the second and third jury notes. At the hearing, testimony was taken regarding those discussions. Moreover, the transcript filed on appeal does contain the discussion between the

Appellants' right to counsel when discussing the jury notes. Muse, however, has not raised a cumulative-error claim, and neither have Darious and Jujuane. Even assuming that these errors should be considered cumulatively, we conclude that Muse and the Harris brothers have failed to establish cumulative prejudice in this case. See *Priester v. State*, 316 Ga. 133, 140 n.5 (886 SE2d 805) (2023) ("Appellant has not raised a cumulative-error claim, and we discern no cumulative prejudice from the evidentiary and instructional errors we assume."); *Jones v. State*, 314 Ga. 605, 617 n.9 (878 SE2d 505) (2022) (explaining that where a defendant seeks a new trial "based on the cumulative effect of errors outside of the evidentiary context, he would do well to explain why cumulative error should be extended beyond the evidentiary context" (cleaned up)).

court and counsel regarding the third jury note. See Division 5 (a) above. To the extent that Darious is contending that the State's mere allegation in its motion that the record was incomplete requires a new trial, Darious failed to preserve the issue for appeal because he could have but did not raise that issue during the second motion for new trial hearing at which the parties offered evidence relevant to reconstructing the record. See *Benton v. State*, 300 Ga. 202, 205 (794 SE2d 97) (2016). Moreover, to the extent that Darious is contending that he is entitled to a new trial because he has been "deprived of an adequate trial transcript" for appeal and therefore "has effectively been denied his right to appeal," *Gadson v. State*, 303 Ga. 871, 877 (815 SE2d 828) (2018), we disagree. Here, the only jury-note discussion missing from the transcript is the discussion regarding the second note. And if, as here, "an otherwise verbatim transcript is missing only one or a few parts of the trial, the appellant is not entitled to a new trial unless he alleges that he has been harmed by some specified error involving the omitted part and shows that the omission prevents proper appellate review of that

error." Id. at 878. Darious has failed to make that showing here, as this Court was able to determine that any violation of Darious's right to counsel relating to the second note was harmless and that there was no violation of his right to be present for the discussion of that note. See Division 5 (c), (d) above. Accordingly, this claim is without merit.

*Judgments affirmed. All the Justices concur.*

Decided June 21, 2023.

Murder. Fulton Superior Court. Before Judge McBurney.

*Sharp Georgia Law Firm, Randall P. Sharp*, for appellant (case no. S23A0316).

*J. M. Raffauf*, for appellant (case no. S23A0373).

*Debra K. Jefferson*, for appellant (case no. S23A0427).

*Fani T. Willis, District Attorney, Michael S. Carlson, Kevin C. Armstrong, Elaine L. Thompson, Juliana Y. Sleeper, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Eric C. Peters, Assistant Attorneys General*, for appellee.