315 Ga. 524
FINAL COPY

S22A0962.  ALLEN v. THE STATE.

BOGGS, Chief Justice.

After successive jury trials in November 2017 and February 2018, Appellant Broderick Allen was acquitted of participation in criminal street gang activity, but convicted of malice murder and related offenses in connection with the shooting deaths of Antony Jackson and Miguel Hayes. On appeal, Appellant contends that the evidence was constitutionally insufficient to support his convictions for the two counts of aggravated assault and two firearm possession charges arising from the November 2017 trial and for the remaining convictions arising from the February 2018 trial. He also contends that the trial court erred by refusing to grant him a new trial under the exercise of its discretion as a "thirteenth juror"; that the trial court erred by denying a motion for mistrial made by Appellant during the November 2017 trial when, according to Appellant, a witness improperly placed his character into evidence; and that the

trial court erred during the February 2018 trial by permitting, over

Appellant's objection, the State to improperly bolster the credibility

of a State's witness. [1]

---

[1] The crimes occurred on November 21, 2012. On May 10, 2013, a Fulton County grand jury indicted Appellant for participation in criminal street gang activity (Count 1), two counts of malice murder (Counts 2-3), four counts of felony murder (Counts 4-7), two counts of aggravated assault (Counts 8-9), possession of a firearm by a convicted felon (Count 10), and possession of a firearm in the commission of a felony (Count 11). Initially, Appellant was tried before a jury from November 6 to 15, 2017, and found guilty of the aggravated assault charges (Counts 8-9) and firearm charges (Counts 10-11). The jury was unable to reach a verdict on the remaining counts. On January 12, 2018, the trial court sentenced Appellant on the two aggravated assault counts and the two firearm counts.

Appellant was retried on the deadlocked counts on a redacted indictment from February 5 to 13, 2018. The jury acquitted Appellant on the street gang charge (Count 1) but found him guilty on the remaining six counts: malice murder (Counts 2-3) and felony murder (Counts 4-7). On February 22, 2018, the trial court sentenced Appellant as to all the charges of which he was found guilty at both trials, specifying that the court was resentencing Appellant on the two aggravated assault counts and the two firearm counts. The court sentenced Appellant to serve two consecutive life terms in prison for malice murder, five years in prison for possession of a firearm by a convicted felon, and a consecutive, suspended term of five years for possession of a firearm during the commission of a felony. The felony murder counts were vacated by operation of law, and the trial court merged the aggravated assault counts into the malice murder convictions.

Although Appellant's case was not subject to appeal under OCGA § 5-6-34 (a) based on convictions on only four of the eleven counts of the indictment at the November 2017 trial, when the trial court entered the final judgment and sentence on February 22, 2018, resolving all counts of the indictment, Appellant's case became subject to direct appeal. See *Seals v. State*, 311 Ga. 739, 743 (860 SE2d 419) (2021) (explaining that a criminal case involving

2

We conclude that the evidence is sufficient to sustain Appellant's convictions and that the trial court did not err in denying Appellant's motion for new trial under the exercise of its discretion as the "thirteenth juror." We also conclude that the trial court did not abuse its discretion in denying the motion for mistrial that Appellant made during the November 2017 trial and that, even if the trial court abused its discretion in permitting the State to improperly bolster the credibility of one of its witnesses during the February 2018 trial, the error was harmless. We therefore affirm.

1. Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trials showed the following.[2]

---

multiple counts is "one case" and is not considered "resolved fully" and subject to appeal under OCGA § 5-6-34 (a) (1) until all counts of the indictment are resolved). On February 26, 2018, Appellant's trial counsel filed a timely motion for new trial, which was amended by appellate counsel on February 3, 2020, June 9, 2020, March 8, 2021, and March 22, 2021. The trial court held hearings on May 19, 2021 and June 17, 2021, and entered an order denying the motion on February 25, 2022. A timely notice of appeal was filed on March 24, 2022, and the case was docketed in this Court to the August 2022 term and submitted for a decision on the briefs.

[2] The evidence presented at Appellant's two trials was substantially the same for purposes of determining the sufficiency of the evidence.

Jackson and Hayes were long-time friends who sold drugs together. In the early afternoon of Wednesday, November 21, 2012, Jackson and Hayes were shot and killed while sitting in a two-door sedan parked in the driveway of a vacant house on a dead-end street in southwest Atlanta. Several local residents witnessed the shooting or its immediate aftermath, and one called 911. The police arrived within minutes and found Jackson's body still buckled in the driver's seat, with five bullet wounds to the right side of his face and other bullet wounds to his right arm, chest, and neck. Hayes was lying halfway out of the passenger side, face down, with multiple bullet wounds to his head, chest, and back. The medical examiner testified that both victims had been shot with bullets of two different sizes, one of which was a "medium to large caliber handgun bullet" fired from a "standard handgun" and one of which was a "relatively small" and "high velocity" bullet. The medical examiner described the latter bullet as one of the most "unusual ammunition [he] ha[d] encountered in the course of looking at number of gunshot—many

4

gunshot wound cases over the years." The victims died from their wounds.

Police investigators found numerous shell casings, bullets, and unfired rounds in and around the car. Additional bullets were recovered from the bodies of Jackson and Hayes. A firearms examiner testified that two firearms were involved: a Glock .40-caliber pistol and a "pretty rare" Fabrique Nationale ("FN") 5.7 x 28mm pistol. Seven spent shell casings from the Glock were found on the rear floorboard and rear passenger seat of the car, while one was found between the front driver's seat and the console. Nine spent shell casings from the FN were found outside the car and one was found inside the car. The murder weapons were not recovered.

Yolanda Worthem, who lived next door to the house where the shooting occurred, testified that at about 2:30 p.m. on November 21, 2012, she was in her bedroom when she heard "three or four" gunshots. She went to her door and "looked out" and "saw one person firing over into a car." The shooter "appeared to maybe [have] a white towel or something [on his head]." After he finished firing, he

5

turned and walked "out of the driveway" and into a nearby "wooded area." Because the shooter's back was turned to Worthem during the incident, she could not describe the shooter other than to say that the shooter appeared to be a man. After the shooter left, Worthem came out of her house and saw three of her neighbors outside, Priscilla Sheppard and Douglas and Trevor Murphy.

Douglas Murphy testified that on the day of the shooting, he was inside his house and heard "what we thought were firecrackers." He and his son, Trevor, went outside. Douglas testified that he saw a man "wearing green with white wrapped around his head standing with his back to us." Trevor added that the man was black and was wearing a "green jacket type thing," with something white "wrapped around his head." Douglas and Trevor heard more shots when they were outside, with Douglas testifying that he "thought [the man] was shooting in the ground." Douglas added that there may have been a total of "eight or ten shots." The man had his back to Douglas and Trevor; as a result, they could not identify the gunman. After the shooting, the man "walked into the wooded area" near the house.

6

Douglas and Trevor both testified that they did not see anyone other than the shooter during the course of the incident.

Priscilla Sheppard, who was dating a man who lived next door to Worthem, testified that on the day of the incident, she was unloading items from her car and taking them into her boyfriend's house when she saw Jackson's car drive down the street. Shortly thereafter, she heard gunshots. She went to a window inside the house, looked out, and heard more gunshots. She saw "a man walking towards that car shooting"; he was wearing "something white around his head." Sheppard added the only person that she saw that was outside at the time of the shooting was the shooter and that, as she was "going in and out of the house" before the shooting, she did not see any other car driving down the street or anyone walking in the street. Like the other witnesses, Sheppard testified that, after the shooting, the man walked into the woods at the end of the street.

A 911 call regarding the incident was received at 2:32 p.m. One of the Atlanta police officers who responded to the call noticed a car

following him closely. When the officer arrived at the scene, the car stopped and Appellant, who was a passenger, got out; he had a bullet wound to his hand and had a white cloth wrapped around it and blood on his shirt. Appellant told the officer, "I was in the car too and he shot me too"; he added that he, Jackson, and Hayes had come to the house to purchase marijuana. Appellant said he was sitting in the back seat of the car, parked in the driveway, when a burgundy four-door sedan pulled up and stopped behind them. A black male got out, walked up to the car, and shot Jackson and Hayes in the head. Appellant said that he tried to grab the gun, and the man shot him in the hand and ran into the woods. Appellant told the officer that he pushed the passenger seat forward, got out by the passenger-side door, and ran into the woods as well. Appellant gave a statement to the police on November 27. In that statement, in contrast to the statements that he made to the officer on the day of the crime, Appellant attributed the shooting to two men who arrived at the scene on foot, not by car, with one approaching the vehicle on the driver's side and one approaching on the passenger side.

Forensic evidence showed that shortly before the shooting, which occurred about 2:30 p.m., there were frequent cell phone calls between Appellant, Jackson, and Hayes. There were communications between Appellant's and Jackson's phones at 12:45 p.m., 1:02 p.m., 1:06 p.m., 1:37 p.m., and 1:58 p.m. Meanwhile, there were communications between Appellant's and Hayes' phones at 1:27 p.m., 1:41 p.m., 1:57 p.m., 2:06 p.m., and 2:18 p.m. In addition, according to Jeremy Andrews, Appellant called him about a half hour before the shooting. Andrews' mother owned the vacant house, and Andrews would sometimes meet friends at the house. According to Andrews, Appellant asked Andrews if he was at the house, and Andrews told him that he was not. Moreover, on the two days following the shooting, Appellant sent several text messages attempting to sell a "mini Glock 40."

In addition, a crime scene reconstruction expert testified that there was a bullet hole in the vehicle's windshield in front of the driver and one in the driver's door window. He added that the fracturing of the glass indicated that both bullets were fired from

9

inside the vehicle. He added that a flight-path rod inserted through the bullet hole in the driver's window indicated that the bullet had been fired from the rear seat of the car. Also, because there was no "bloodstain pattern within the door jam[b]," the expert opined that the driver's door was closed at the time of the shooting. He added that the crime scene was not consistent with the driver, Jackson, being shot from outside the vehicle, but that the forensic evidence showed that Hayes could have first been shot from the back seat of the car and then, once he had fallen partially out of the car, been shot by someone standing outside the car.

Hayes' fiancée, Destinii Knight, testified that Hayes was a marijuana dealer and a member of the "Crips" gang, that he had recently purchased an FN pistol, and that on the day of the shooting he left the house around 2:15 to 2:30 p.m., after having an argument with someone on the phone about "Crips and Bloods." He took with him the pistol, a large amount of cash, and three one-pound bags of marijuana.

Ashley Neff, Appellant's friend, testified that Appellant was a member of the "Bloods" gang who sold marijuana, and that Appellant told her he was a "hitman for hire." She said that Appellant always carried two firearms, "[a] .40 and a .45." She testified that Appellant suspected that Hayes had stolen a gun from him and that Appellant told her about an encounter in which he pulled a gun on Jackson and Hayes and demanded his gun back. According to Neff, Hayes told Appellant that he did not know who had taken the pistol but he would give it to Appellant if he found it. Neff also testified that Appellant typically wore baggy cargo shorts in which he carried his firearms, an "army fatigue, greenish tan" trench coat, and a turban, either a white one or a "Jamaican colored" one.

2. Appellant contends that the evidence was constitutionally insufficient to support his convictions for malice murder, possession

of a firearm by a convicted felon, and possession of a firearm during the commission of a felony.[3]  We disagree.

When evaluating the sufficiency of the evidence as a matter of federal due process, we view the evidence presented at trial in the light most favorable to the verdicts and consider whether it was sufficient to authorize a rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Moore v. State*, 311 Ga. 506, 508 (858 SE2d 676) (2021). This "limited review leaves to the jury the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts

---

[3] To the extent that Appellant claims that the evidence presented at the November 2017 trial was insufficient to sustain the jury's guilty verdicts on the two counts of aggravated assault, his challenges are moot because those counts were merged following the second trial, and no sentence was entered on them. See *Beamon v. State*, 314 Ga. 798, 800 n.2 (879 SE2d 457) (2022). Likewise, to the extent that Appellant claims that the evidence presented at the February 2018 trial was insufficient to sustain the jury's guilty verdicts on the four felony murder counts, his challenges are moot because those counts were vacated by operation of law, and no sentence was entered on them. Id.

to ultimate facts." *Rich v. State*, 307 Ga. 757, 759 (838 SE2d 255) (2020) (citation and punctuation omitted). Moreover, when we review the sufficiency of the evidence under *Jackson v. Virginia*, "we consider *all* the evidence admitted at trial, regardless of whether the trial court erred in admitting some of that evidence." *Davenport v. State*, 309 Ga. 385, 397 (846 SE2d 83) (2020) (emphasis in original).

Appellant argues that none of the State's witnesses were able to identify him as the person they saw shooting near the car and walking into the woods. In addition, he argues that the State did not introduce evidence that either of the handguns used in the crimes was recovered from Appellant or from a location connected to him and, likewise, did not introduce any fingerprint or DNA evidence directly proving that Appellant shot the victims. However, that does not mean that the evidence presented was insufficient. "[A]lthough the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." *Rich*, 307 Ga. at 759 (citation and punctuation omitted). Here, when properly viewed in the light most favorable to the

13

verdicts, the evidence presented at Appellant's trial showed that Appellant was angry with Hayes because Appellant suspected that Hayes had stolen a gun from him; that Appellant had previously pulled a gun on Jackson and Hayes; and that Appellant, through numerous phone calls, arranged to go to the vacant house with Jackson and Hayes after confirming with Andrews, his friend and the son of the owner of the vacant property, that no one would be present at the house. Moreover, the evidence showed that Appellant's stories about the shooting were inconsistent, changing from a story of a lone shooter who arrived at the house by car to one in which there were two shooters who arrived on foot. And contrary to Appellant's statements that the gunshots were fired from outside the car, the forensic evidence showed that many of the gunshots were fired from inside the car, including from the back seat, where Appellant admitted that he was seated.

In addition, the testimony of four eyewitnesses contradicted Appellant's statements. The eyewitnesses described the shooter as being the only person that they saw run into the woods, which

contradicted Appellant's statement on the day of the crimes that the shooter ran into the woods first, followed by Appellant getting out of the back seat of the car and then running into the woods. Also contrary to Appellant's statements was Sheppard's testimony that she did not see any other car driving down the street or anyone walking in the street at the time of the shooting. Finally, Neff, Appellant's friend, testified that Appellant typically wore the type of clothing that the shooter was wearing and that he owned a .40-caliber pistol, which was the caliber of one of the pistols used in the shooting. Appellant also attempted to sell his "mini Glock 40" pistol in the days after the crimes. A rational jury could infer from this evidence that Appellant drove with the victims to the vacant house, where he shot and killed them, and that he had previously been convicted of a felony when he did so.[4] Accordingly, the evidence

---

[4] The State presented a certified copy of Appellant's 2006 conviction for robbery by force, see OCGA § 16-8-40 (a) (1), showing that at the time of the shootings Appellant was a convicted felon.

presented at trial was legally sufficient to support Appellant's conviction for malice murder and the two firearm offenses.

3. Allen next argues that the trial court failed to exercise its discretion as the thirteenth juror and grant him a new trial under OCGA §§ 5-5-20 and 5-5-21.[5] The record, however, does not support this claim. Instead, it shows that the trial court properly exercised its authority in refusing to grant a new trial on the general grounds. The trial court found that "the jury's guilty verdict was not 'contrary to [the] evidence and the principles of justice and equity.' OCGA § 5-5-20. Nor was the verdict 'decidedly and strongly against the weight of the evidence.' OCGA § 5-5-21." The court also stated that

---

[5] OCGA §§ 5-5-20 and 5-5-21, respectively, allow the trial court to grant a new trial "[i]n any case when the verdict of a jury is found contrary to evidence and the principles of justice and equity," or when "the verdict may be decidedly and strongly against the weight of the evidence even though there may appear to be some slight evidence in favor of the finding." "Grounds for a new trial under these Code sections are commonly known as the 'general grounds,'" *Donaldson v. State*, 302 Ga. 671, 672 n.2 (808 SE2d 720) (2017), and "[t]he two statutes give the trial court broad discretion to sit as a thirteenth juror and weigh the evidence on a motion for new trial alleging these general grounds." *Fortson v. State*, 313 Ga. 203, 212 (869 SE2d 432) (2022) (citation and punctuation omitted).

it had "exercised its discretion and independently weighed the evidence in ruling on the merits of [Appellant's] OCGA §§ 5-5-20 and 5-5-21 claims," and that its "conscience approves this verdict." "[O]nce we have determined that the trial court properly exercised its authority in refusing to grant a new trial on the general grounds, we cannot review the merits of that decision by the trial court." *Donaldson v. State*, 302 Ga. 671, 674 (808 SE2d 720) (2017). "Instead, this Court's review of the trial court's ruling on the general grounds is limited to sufficiency of the evidence under *Jackson v. Virginia*." *Ward v. State*, 313 Ga. 265, 268 n.5 (869 SE2d 470) (2022) (citation and punctuation omitted). And as explained above, the evidence was sufficient to support Appellant's convictions under *Jackson v. Virginia*. Accordingly, this enumeration of error is meritless.

4. Appellant contends that, with regard to the November 2017 trial, the trial court erred by denying the motion for mistrial that he made in response to improper "bad character" testimony by Herlisha

17

McCoy, Jackson's former fiancée and the mother of two of Jackson's children. We disagree.

(a) As background, the prosecutor asked McCoy if she knew Appellant, and McCoy testified that she "kn[e]w of him." The prosecutor then asked her if she knew his name, and McCoy responded that she did not know his "birth name" but knew him as "Metro." The prosecutor asked McCoy to "[t]ell the jury how you knew him as Metro." McCoy testified that he had come to her house once in high school and that Jackson had told her that Appellant had "killed a lot of people and got away with it." Appellant's counsel asked to approach the bench, and the jury was excused. Based on McCoy's testimony, defense counsel moved for a mistrial. The trial court reserved ruling on the motion for mistrial, but gave a curative instruction, telling the jury that

> just before we broke for the break Ms. McCoy made a statement that was highly improper and inflammatory. She is the girlfriend of one of the victims, and she is the fiancée and mother of two of his children, and she made a statement about what she says he told her, which she has no personal knowledge of at all. It is not evidence in this

18

case. I am asking you to completely disregard it. It was highly improper.

At that point, Appellant did not renew his motion for mistrial. Instead, McCoy's testimony continued. Later during her testimony, when she was explaining that she and Jackson went to see Appellant at his mother's home, she testified that Appellant "had sold [Jackson] a gun." The jury was again excused, and defense counsel said that she "want[ed] to renew [her] motion for a mistrial." After a lengthy colloquy, the trial court ruled that it was denying defense counsel's "new motion" for mistrial, adding that the court "still reserved the other motion." Later in the trial, defense counsel said that, with regard to the first motion for mistrial made during McCoy's testimony, "the court had said that you were reserving ruling, and we just wanted to get your ruling on the record"; "[w]e just need a ruling one way or the other." The trial court said, "[w]ell, I'm going to deny the motion for mistrial."

(b) On appeal, Appellant contends that the trial court abused its discretion in failing to grant his motion for mistrial after McCoy

testified that Jackson had told her that Appellant had "killed a lot of people and got away with it." The State argues that Appellant failed to preserve this issue for appeal by not renewing that motion for mistrial immediately following the trial court's curative instruction. However, because we conclude that the trial court did not abuse its discretion in denying the motion, we do not address whether Appellant failed to preserve the issue. See *Horton v. State*, 310 Ga. 310, 317 and n.8 (849 SE2d 382) (2020) (declining to address whether the defendant failed to preserve a mistrial issue by not renewing "his motion for mistrial after the trial court's curative instruction or object[ing] to the instruction as inadequate," because "we conclude that the trial court did not abuse its discretion in denying [the defendant's] motion").

(c) "Whether to grant a motion for mistrial is within the trial court's sound discretion, and the trial court's exercise of that discretion will not be disturbed on appeal unless a mistrial is essential to preserve the defendant's right to a fair trial." *Hill v. State*, 310 Ga. 180, 189 (850 SE2d 110) (2020) (citation and

20

punctuation omitted). "Trial courts are vested with great discretion to grant or deny mistrials because they are in the best possible position to determine whether one is warranted." *Simmons v. State*, 308 Ga. 327, 329 (840 SE2d 365) (2020) (citation and punctuation omitted).

> A trial court's denial of a motion for mistrial based on the improper admission of bad character evidence is reviewed for abuse of discretion by examining factors and circumstances, including the nature of the statement, the other evidence in the case, and the action taken by the court and counsel concerning the impropriety.

*Thrift v. State*, 310 Ga. 499, 503 (852 SE2d 560) (2020) (citation and punctuation omitted). Furthermore, "it is well established that a trial court can negate the potentially harmful effect of improperly introduced evidence by prompt curative instructions rather than by granting a mistrial" and that "juries are presumed to follow curative instructions in the absence of proof to the contrary." *Lewis v. State*, 314 Ga. 654, 667 (878 SE2d 467) (2022) (citations and punctuation omitted). And when a witness makes a prejudicial comment about a defendant, a "new trial will not be granted unless it is clear that the

trial court's curative instruction failed to eliminate the effect of the prejudicial comment." *Golden v. State*, 310 Ga. 538, 546 (852 SE2d 524) (2020) (citation and punctuation omitted).

Here, after McCoy's testimony, the trial court immediately gave a curative instruction, informing the jury that the testimony "was highly improper," that the witness had "no personal knowledge" of what she was talking about, that her statement "[was] not evidence in this case," and that the jury must "completely disregard" the testimony. Moreover, the testimony was cumulative of other evidence in the case, including testimony by Neff that Appellant told her that "he was a hitman for hire" and evidence of a Twitter post by Appellant describing himself as a "one man army hit squad." In addition, it is apparent that McCoy's statement that Jackson had told her that Appellant had killed people was not responsive to the prosecutor's question regarding how she knew "Metro." As the prosecutor explained, he "thought [he] was eliciting testimony that [McCoy] knew Metro through Antony Jackson"—he added that "I thought she was going to say that that's how she knew

22

him." Under these circumstances, we conclude that the trial court did not abuse its discretion in denying Appellant's motion for mistrial. See *Golden*, 310 Ga. at 546-547 (holding that the trial court's curative instruction was sufficient to protect the defendant from the prejudicial effect of a witness' statement that the defendant, who killed the victim as part of a robbery, had previously robbed someone else and that the trial court therefore did not abuse its discretion in denying the defendant's motion for new trial); *Thrift*, 310 Ga. at 503-504 (holding that where the defendant moved for a mistrial after a State's witness testified that the defendant, who was holding a gun in his hand, threatened to kill the witness if he told anyone that the defendant had killed the victim, the trial court did not abuse its discretion in denying the motion because the witness' answer was unresponsive to the State's question and because the "trial court took immediate corrective action . . . , instructing the jury to disregard any mention of a threat or a gun").

5. Appellant contends that, with regard to the February 2018 trial, the trial court erred by allowing Officer Jimmy Butler to

23

testify, over Appellant's objection, that Douglas Murphy told him at the crime scene that there was an "individual that fled the scene. He was wearing a green shirt and, like, he had a white towel wrapped around his head, and he hit the wood line." The trial court overruled Appellant's objections that the testimony was inadmissible hearsay and that it improperly bolstered Douglas' testimony. We conclude that, even if the trial court abused its discretion in admitting the testimony, the error was harmless.

Here, before Officer Butler took the stand, Douglas had already testified. According to Douglas' testimony, the shooter was "wearing green with white wrapped around his head standing with his back to us" and "walked into the wooded area" near the house after the shooting. Appellant did not conduct any cross-examination of Douglas. As is evident, Douglas' statement on the day of the shooting, as recounted by Officer Butler, was consistent with his trial testimony.

Under OCGA § 24-8-801 (d) (1) (A),

24

[a]n out-of-court statement shall not be hearsay if the declarant testifies at the trial or hearing, is subject to cross-examination concerning the statement, and the statement is admissible as a . . . prior consistent statement under Code Section 24-6-613 or is otherwise admissible under this chapter.

Because Douglas testified at trial and was subject to cross-examination, the remaining question under OCGA § 24-8-801 (d) (1) (A) is whether his statement was admissible as a prior consistent statement under OCGA § 24-6-613 (c). See *McGarity v. State*, 311 Ga. 158, 165 (856 SE2d 241) (2021) (explaining that prior consistent statements are not admissible if their only purpose is to bolster a witness' trial testimony, but that they may be admissible if they meet the requirements of OCGA § 24-6-613 (c)). However, because we conclude that any error in admitting Douglas' statement was harmless, we need not address whether it was admissible as a prior consistent statement under OCGA § 24-6-613 (c).

Appellant argues that the admission of Douglas' statement was harmful because it bolstered his credibility. But we conclude that the admission of Douglas' statement does not rise to the level of

harmful error. "A nonconstitutional error is harmless if the State shows that it is highly probable that the error did not contribute to the verdict, an inquiry that involves consideration of the other evidence heard by the jury." *Smith v. State*, 313 Ga. 584, 587 (872 SE2d 262) (2022) (citation and punctuation omitted). "In determining whether trial court error was harmless, we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." Id. at 588 (citation and punctuation omitted). Moreover, "[w]here improper bolstering has occurred, this determination must be made without reliance on the testimony that was improperly bolstered, as the very nature of the error is that it is repetitive of that to which the witness has already testified." *McGarity*, 311 Ga. at 167 (citation and punctuation omitted). "Instead, we must consider factors such as whether the State's case was based primarily on the bolstered testimony, and whether the improper bolstering added critical weight to that testimony." Id. (citation and punctuation omitted).

26

In the statement that Appellant contends was improperly admitted, Douglas said that the shooter "was wearing a green shirt and, like, he had a white towel wrapped around his head, and he hit the wood line." This statement was cumulative of other properly-admitted evidence, as other witnesses gave similar descriptions of the shooter. Trevor Murphy described the shooter as wearing a "green jacket type thing," with something white "wrapped around his head"; Worthem said that the shooter "appeared to maybe [have] a white towel or something [on his head]"; and Sheppard testified that he had "something white around his head."

In addition, apart from Douglas' bolstered testimony, the evidence that Appellant, and not, as he claimed, another person or persons, shot the victims was substantial. That evidence included evidence of Appellant's prior altercation with Hayes and Jackson; that Appellant arranged the meeting with the victims after confirming that no one would be present at the house where the crimes occurred; that Appellant was admittedly seated in the back seat from which shots were fired; that Appellant typically wore the

type of clothing that the shooter was wearing; that he owned one of the types of pistols used in the shooting and attempted to sell that pistol in the days after the crimes; that he gave inconsistent statements to law enforcement officials; and that Appellant's version of events was inconsistent with forensic evidence and eyewitness accounts. In sum, we conclude that it is highly probable that any error in admitting the prior consistent statement of Douglas did not contribute to the verdicts finding Appellant guilty of malice murder. See *Puckett v. State*, 303 Ga. 719, 722 (814 SE2d 726) (2018) (holding that even if the trial court had erred in allowing evidence of a witness' "prior consistent statements, the error would have been harmless, as the testimony was largely cumulative" of the properly admitted testimony of other witnesses); *Cowart v. State*, 294 Ga. 333, 342 (751 SE2d 399) (2013) (holding that error in admitting a prior statement to bolster a witness' testimony was harmless because of the "strong evidence" against the defendant, apart from the improperly bolstered testimony).

*Judgment affirmed. All the Justices concur.*

28

Decided February 7, 2023.

Murder. Fulton Superior Court. Before Judge McBurney.

*David A. Hoort*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Kevin C. Armstrong, Ruth M. Pawlak, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth H. Brock, Michael A. Oldham, Assistant Attorneys General*, for appellee.