NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided:  September 6, 2023

S23A0736.  WILKERSON v. THE STATE.

BOGGS, Chief Justice.

Appellant Kentavous Wilkerson challenges his 2019 convictions for felony murder and other crimes in connection with the shooting death of Bradley Green and the non-fatal shooting of Rodney Greene. On appeal, Appellant contends that (1) the evidence was constitutionally insufficient to support his convictions, (2) the trial court erred in failing to instruct the jury on voluntary manslaughter, and (3) the trial court abused its discretion in denying the motions for mistrial that he made following the prosecutor's statements to the jury indicating that Appellant had been in jail for more than two years before trial. For the reasons that follow, we affirm.[1]

---

[1] The crimes occurred on July 15, 2017. On May 28, 2019, a Sumter County grand jury indicted Appellant for felony murder, possession of a

Viewed in the light most favorable to the verdicts, the evidence at trial showed as follows. On July 15, 2017, hundreds of people attended an event known as the "Southside Reunion" at a park on the south side of Americus, Georgia. More than 100 members of the "Gangster Disciples" street gang, whose territory was on the south side of Americus, were present at the event. Sakeitha Waters, Appellant's sister, attended the event and bought a marijuana cigarette for five dollars from Greene, who was affiliated with the Gangster Disciples. She did not feel that she had gotten her money's worth and argued with Greene, but he refused to refund her money, so she snatched a small plastic bag containing pills from his pocket. Waters then called Appellant and asked if he wanted some pills.

firearm during the commission of a felony, aggravated assault against Green, and aggravated assault against Greene. At a trial from July 15 to 18, 2019, the jury found Appellant guilty of all charges. The trial court sentenced Appellant to serve life in prison with the possibility of parole for felony murder, a concurrent term of 20 years for the aggravated assault of Greene, and a term of five years for possession of a firearm during the commission of a felony, consecutive to the sentence for felony murder. The count of aggravated assault against Green merged. Appellant filed a timely motion for new trial, which he amended with new counsel on June 18, 2021. On February 8, 2023, the court denied Appellant's motion. Appellant filed a timely notice of appeal, and the case was docketed to this Court's April 2023 term and submitted for a decision on the briefs.

After Appellant overheard Greene make threats to Waters during the call, Appellant asked where she was and asked her to pick him up. When the phone call ended, Waters returned the pills to Greene, he refunded her money, and the two of them separated. Waters then left the park, picked up Appellant, and returned to the park with him.

Appellant was affiliated with the "Bloods" street gang, which operated on the north side of Americus, and he arrived at the park wearing a red bandana, a color associated with the Bloods gang. Appellant walked directly to Greene, and the two men argued for several minutes. Greene, described by a witness as "amped," told Appellant that he was "not supposed to be on the south side" and threatened to "f**k [him] up" and make him "bleed" if he did not leave. Appellant told Greene that he did not want to fight. Several people approached Appellant and Greene and tried to calm the situation, with Rogers Jackson and Daryl Lewis leading Appellant down a street and away from Greene and the reunion, as others attempted to hold Greene back. Greene, however, followed

3

Appellant down the street and continued to verbally threaten him. Jackson testified that Appellant said that "he wanted to walk away peacefully," and Jackson described Appellant as "chill" during the altercation. However, Jackson added that Appellant kept reaching in his back pocket like he had a gun and "warned that he was not going to be fighting" and that "it's not going to be good." Other witnesses also testified that Appellant was flashing a gun as he was moving down the street, with one witness stating that Appellant "was showing [Greene] the pistol" to make Greene know that if it came to a fight, Appellant "was going to shoot him."

When Greene was 20 or more feet away from Appellant, Appellant turned toward Greene and pulled out a gun. A witness testified that, as Greene was "coming back towards" the crowd and was no longer facing Appellant, Appellant fired a shot and hit Greene in the buttocks. After being shot, Greene ran between two cars toward the crowd. After two or three seconds, as Appellant "was tracing" Greene through the crowd with the gun, Appellant fired again but missed Greene and instead struck bystander Green in the

4

chest. One witness described Appellant as taking a "coward shot," saying that Appellant "had got far enough away from the scene and was safe, and fired back into a crowd of people." Multiple witnesses testified that although Greene was belligerent, Greene was unarmed and never struck, swung at, or charged Appellant. After the shooting, Appellant fled the scene with Waters; the gun was never recovered. After the shooting, Greene ran into Jackson, who drove Greene to the hospital. While Greene survived, bystander Green, who was taken by ambulance to the hospital, died from the gunshot wound.

Appellant elected not to testify but called a number of defense witnesses, including Waters, his father, and his cousin. Waters testified that Greene reached in the front of his pants as though he were going for a weapon when Appellant and Greene were arguing face-to-face, but admitted that she never saw Greene with a gun. Vincent Wilkerson, Appellant's cousin, testified that once the shooting started, he walked to his car to leave the event. As he was doing so, Greene, who was holding a ".38 snub nose" revolver, came

5

"running towards [him]" and was "hollering" at him. Greene got into the passenger side of a car, sitting with one leg in the car and one leg outside the car. Greene was by himself. Vincent added that Greene pulled down his pants and showed him where he had been shot. Vincent could see the bullet sticking out of Greene's "butt." Vincent testified that he assured Greene that he would be "all right. It's only a flesh wound." Vincent spoke with Greene for several minutes, and no one else came to the car during that time. Christopher Wilkerson, Appellant's father, testified that, during the initial part of the altercation between his son and Greene, Greene put his hand on the handle of a gun that was in his waistband but did not pull it out. Christopher did not see the shooting. Both Vincent and Christopher acknowledged that the first time they had told anyone that Greene was armed was in conversation with defense counsel a few weeks before trial. Another defense witness testified at trial that she had only heard two shots and never saw Greene with a gun, but in her statement to the police on the night of the crimes, which was played for the jury, she said that she thought

she had heard three shots and that she had seen smoke near Greene but did not see him with a gun.

The State called Jackson as a witness again to rebut Vincent's testimony of his encounter with Greene. Jackson testified that shortly after the shots were fired, he saw Greene and they both ran to Jackson's car. According to Jackson, Greene was not holding a gun. Jackson added that, when they got to Jackson's car, Jackson reclined his passenger seat and Greene laid face down on it, facing the backseat of the car. Jackson testified that Greene did not speak to anyone before Jackson drove him to the hospital.

1. Appellant argues that the evidence was constitutionally insufficient to support his convictions because the evidence showed that he acted in self-defense. We disagree.

When evaluating the sufficiency of the evidence as a matter of federal due process, we view the evidence presented at trial in the light most favorable to the verdicts and consider whether it was sufficient to authorize a rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crimes of which he was

7

convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Moore v. State*, 311 Ga. 506, 508 (858 SE2d 676) (2021). This "limited review leaves to the jury the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts." *Rich v. State*, 307 Ga. 757, 759 (838 SE2d 255) (2020) (cleaned up).

At trial, Appellant claimed that he acted in self-defense, and the trial court instructed the jury to consider that affirmative defense. "[A] person is justified in using force which is intended or likely to cause death or great bodily harm only if he . . . reasonably believes that such force is necessary to prevent death or great bodily injury to himself . . . ." OCGA § 16-3-21 (a). "When a defendant presents evidence that he was justified in using deadly force, the State bears the burden of disproving the defense beyond a reasonable doubt." *Birdow v. State*, 305 Ga. 48, 50 (823 SE2d 736) (2019). However, "[a]s we have explained before, issues of witness credibility and the existence of justification are for the jury to

8

determine, and it is free to reject a defendant's claim that he acted in self-defense." *Ivey v. State*, 305 Ga. 156, 159 (824 SE2d 242) (2019) (cleaned up).

The evidence here authorized the jury to reject Appellant's claim that he shot the victims because he reasonably feared for his life. Although many witnesses testified that Greene was the aggressor during the altercation and several members of Appellant's family testified that Greene was armed, multiple witnesses testified that Greene was unarmed, that Greene never moved to strike Appellant, and that the confrontation was entirely verbal before Appellant opened fire. And even the defense witnesses who testified that Greene had a weapon did not testify that they saw him draw the weapon before the shooting or that Appellant was aware of the weapon. Moreover, at the time of the shooting, Greene and Appellant were no longer arguing face-to-face, and Appellant was separated from Greene by a distance of 20 or more feet. Greene was also hit in the buttocks, supporting witness testimony that he was turned away from Appellant at the time of the shooting. Finally,

there was testimony that Appellant "was tracing" Greene through a crowd while Greene was running away from Appellant when he fired the shot that struck and killed Green, an innocent bystander.[2] When viewed in the light most favorable to the verdicts, the evidence presented at trial was sufficient to authorize a rational jury to find beyond a reasonable doubt that Appellant did not shoot at Greene in self-defense and that Appellant instead was guilty of the crimes for which he was convicted, including felony murder and aggravated assault. See *Jackson v. State*, 315 Ga. 543, 550-551 (883 SE2d 815) (2023) (holding that where, among other things, there was evidence showing that the victims were not armed at the time of the shooting and that one of the victims was walking away from the defendant

---

[2] We note that the trial court charged the jury on the doctrine of transferred intent. Under that doctrine, "when an unintended victim is struck down as a result of an unlawful act actually directed against someone else, the law prevents the actor from taking advantage of his own wrong and transfers the original intent from the one against whom it was directed to the one who actually suffered from it." *Smith v. State*, 315 Ga. 357, 364 (882 SE2d 289) (2022) (cleaned up). Similarly, the trial court charged on the principle of transferred justification, under which "no guilt attaches if an accused is justified in shooting to repel an assault, but misses and kills an innocent bystander." *Howard v. State*, 307 Ga. 12, 22 (834 SE2d 11) (2019) (cleaned up).

when he was shot, the jury was authorized to reject the defendant's claim of self-defense).

2. Appellant contends that the trial court committed plain error in failing to charge the jury on voluntary manslaughter. We disagree.

Although Appellant requested a charge on voluntary manslaughter, the trial court informed the parties that it would not give the charge. In its charge to the jury, the trial court did not charge on voluntary manslaughter, and Appellant did not object to the court's failure to do so. For that reason, we review Appellant's claim for plain error only. See OCGA § 17-8-58 (b); *Davis v. State*, 312 Ga. 870, 873 (866 SE2d 390) (2021) (explaining that the failure to charge the jury on voluntary manslaughter could be reviewed only for plain error where the appellant "made a written request for a jury charge on voluntary manslaughter" and argued the point at the charge conference but "did not object to the omission of the charge after the trial court instructed the jury"). Reversal is not authorized under plain error review unless "the instruction was erroneous, the

11

error was obvious, the instruction likely affected the outcome of the proceedings, and the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Davis*, 312 Ga. at 873-874. "We need not analyze all of the elements of this test when, as in this case, the defendant has failed to establish one of them." *Jones v. State*, 314 Ga. 466, 469 (877 SE2d 568) (2022) (cleaned up).

A person commits voluntary manslaughter when he causes the death of another "under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person." OCGA § 16-5-2 (a). "A trial court is required to grant the defendant's request for a charge on the lesser included offense of voluntary manslaughter if there is any evidence, however slight, to support such a charge. Whether such slight evidence exists is a question of law." *Munn v. State*, 313 Ga. 716, 721 (873 SE2d 166) (2022) (cleaned up).

Appellant argues that a voluntary manslaughter instruction was justified because Greene seriously provoked Appellant,

emphasizing that the two were involved in a heated argument during which Greene pursued, verbally abused, and threatened to harm Appellant. However, "neither fear that someone is going to pull a weapon nor fighting are the types of provocation that demand a voluntary manslaughter charge." *Rountree v. State*, 316 Ga. 691, 694 (889 SE2d 803) (2023) (cleaned up). Accord *Burke v. State*, 302 Ga. 786, 790-791 (809 SE2d 765) (2018) (explaining that "acting out of fear of bodily harm is not the same as acting in the heat of passion, and only evidence of the latter supports a voluntary manslaughter conviction"). Moreover, "angry statements alone ordinarily do not amount to 'serious provocation' within the meaning of OCGA § 16-5-2 (a). To put it simply, words alone generally are not sufficient provocation to excite the passion necessary to give rise to voluntary manslaughter." *Rountree*, 316 Ga. at 694 (cleaned up).

> Indeed, "words alone, regardless of the degree of their insulting nature, will not in any case justify the excitement of passion so as to reduce the crime from murder to manslaughter when the killing is done solely on account of the indignation aroused by use of opprobrious words."

13

Id. at 694-695 (cleaned up).

Appellant did not testify at trial, and testimony at trial described him as "chill" during the altercation. Moreover, the threatening words that witnesses testified were used by Greene "were still only words." Id. at 695. For the foregoing reasons, we conclude that Appellant has failed to show that the trial court erred by failing to charge the jury on voluntary manslaughter, much less that the trial court committed plain error. See id. (holding that neither the defendant's fear arising from evidence that the victim brought a gun to his home nor the victim's use of threatening words required a charge on voluntary manslaughter); *Behl v. State*, 315 Ga. 814, 816-817 (885 SE2d 7) (2023) (rejecting the defendant's contention that evidence of "'heated arguments and physical beatings'" that preceded the killing of the victim warranted a charge on voluntary manslaughter); *Collins v. State*, 312 Ga. 727, 740 (864 SE2d 85) (2021) (the defendant's testimony did not require a charge on voluntary manslaughter where the defendant testified that the victim called him a "'mother f**ker' to his face, threatened to kill

14

him, and pulled a handgun on him," but "never testified that he was angry or mad or that he had any other response showing he might have reacted passionately").

3. Appellant contends that the trial court abused its discretion in denying motions for mistrial that he made following the prosecutor's statements to the jury indicating that Appellant had been in jail for more than two years before trial. We conclude that the trial court did not abuse its discretion in denying the motions for mistrial.

At trial, Appellant called his cousin, Vincent Wilkerson, as a witness. Vincent testified, among other things, that he had seen Greene with a gun on the day of the crimes. On cross-examination, Vincent acknowledged that the first time that he had told anyone about Greene's possession of a gun was when he told defense counsel "a few weeks" before trial. The prosecutor asked Vincent if he knew that Appellant had been arrested for murder shortly after the crimes and had been incarcerated awaiting trial on the charges for just over two years. Vincent responded that he did, and the prosecutor asked

Vincent why, knowing that his cousin "was sitting in jail," he had not told anyone that he saw Greene with a gun during the two year period before he informed defense counsel. Appellant moved for a mistrial on the ground that the prosecutor had improperly placed his character in evidence. The trial court denied the motion, but instructed the State to avoid reference to Appellant's custodial status. A curative instruction was given to the jury noting that the fact that the defendant was held in jail, if true, was not to be held or considered against him. After the defense rested, the State called a rebuttal witness, which prompted Appellant to recall Vincent to the stand. On cross-examination, the prosecutor again asked Vincent why he waited two years to inform anyone that he had seen Greene with a gun, knowing that Appellant was in jail awaiting trial on charges relating to the shooting of Greene. Appellant did not move for a mistrial at that time. Instead, only after Appellant engaged in further direct examination of Vincent and after the evidence was closed and the trial court discharged the jury for the day did Appellant move for a mistrial. The trial court denied the motion.

16

Even assuming that Appellant's second motion for mistrial was timely, Appellant has failed to show that the trial court abused its discretion in denying both the first and second motions. "Whether to grant a motion for mistrial is within the trial court's sound discretion, and the trial court's exercise of that discretion will not be disturbed on appeal unless a mistrial is essential to preserve the defendant's right to a fair trial." *Allen v. State*, 315 Ga. 524, 532 (883 SE2d 746) (2023) (cleaned up). Appellant claims that the prosecutor placed prejudicial information about his character before the jury and that a mistrial was necessary to preserve his right to a fair trial. We disagree.

We have held that "evidence that an accused has been confined in jail in connection with the case at issue does not place his character in evidence." *Bright v. State*, 292 Ga. 273, 275 (736 SE2d 380) (2013) (quoting *Jackson v. State*, 284 Ga. 484, 486 (668 SE2d 700) (2008)). Accord *Early v. State*, 313 Ga. 667, 671 (872 SE2d 705) (2022) (explaining that "the jury would not have been unfairly influenced by the fact that a defendant charged with murder was

17

being detained while awaiting trial"); *Rivers v. State*, 296 Ga. 396, 402 (768 SE2d 486) (2015) ("evidence that an accused has been confined in jail in connection with the case at issue does not place his character in evidence"), overruled on other grounds by *State v. Lane*, 308 Ga. 10, 23 (Appendix) (838 SE2d 808) (2020). Accordingly, here, because the prosecutor's references to Appellant being in jail for the charges on which he was on trial did not place his character in issue, we conclude that the trial court did not abuse its discretion in denying Appellant's motions for mistrial. See *Rivers*, 296 Ga. at 402 (holding that question on cross-examination referencing that the defendant had been in jail in connection with the case for which he was on trial did not place his character in evidence and did not warrant the grant of a mistrial).[3]

---

[3] Appellant also contends on appeal that the trial court should have granted a mistrial because the prosecutor's comment undermined the presumption of innocence, but Appellant did not raise this ground for mistrial at trial, and we therefore do not address it. See *Jeffers v. State*, 290 Ga. 311, 314 (721 SE2d 86) (2012) (noting that "standard practice . . . allows parties to raise on appeal only the same objections that were properly preserved below" and holding that the defendant failed to preserve a ground for mistrial raised on appeal that was different from the ground asserted at trial).

*Judgment affirmed. All the Justices concur.*