NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: March 17, 2026

S26A0272.  PATTERSON v. THE STATE.

MCMILLIAN, Justice.

Kiwani Patterson appeals from his convictions for malice murder and other crimes in connection with the shooting death of Tarik Bentley.[1] On appeal, Patterson alleges that (1) the evidence

---

[1] The crimes occurred on April 24, 2016. On August 17, 2016, a Chatham County grand jury indicted Patterson for malice murder (Count 1), two counts of felony murder (Counts 2 and 3), possession of a firearm during the commission of a felony (Count 4), and possession of a firearm by a convicted felon during a crime (Count 5). At a trial conducted from February 24 to 26, 2020, a jury found Patterson guilty of all counts. On March 5, 2020, the trial court sentenced Patterson to serve life in prison without the possibility of parole for Count 1 and a consecutive 15-year sentence for Count 5. Counts 2 and 3 were vacated by operation of law, and the trial court merged Count 4 into Count 5 for sentencing purposes. Patterson filed a timely motion for new trial on April 3, 2020. Following a hearing, the trial court denied the motion on June 10, 2024. Patterson did not timely appeal from that order, but on August 27, 2024, he filed a notice of appeal and a separate motion for reconsideration and extension of time to file a notice of appeal. On August 29, 2024, the trial court set aside its June 10, 2024 order denying Patterson's motion for new trial and again denied Patterson's motion for new trial. Patterson then filed a new notice of appeal on September 10, 2024. After being docketed to this Court in December 2024, that appeal was dismissed and remanded for the trial court to

presented at trial was insufficient to support the verdict, (2) the trial court erred by denying Patterson's motion for new trial on the general grounds, and (3) Patterson received ineffective assistance of counsel. For the reasons that follow, we affirm.

The evidence at trial showed that in the early morning hours of April 24, 2016, Kontina Gibbs, her adult son Breyon Gibbs, Cornelius Williams, Z. S., and Patterson were at Kontina's house. Kontina testified that, while she was getting ready for work, Bentley arrived at the house. Z. S. – who was nine years old – and Williams were asleep in a bedroom right off the "very, very small" living room. Kontina was loading her car for work and asked Bentley to put her laptop in the car. Breyon was also outside with Kontina during this time. Bentley then went to his car, "lookin[g] for somethin[g]." When Bentley headed back towards the house, he was carrying a handgun. He went inside, and the screen door closed behind him.

correct a jurisdictional issue. See *Patterson v. State*, 321 Ga. 487 (2025). The trial court resolved the jurisdictional issue and entered a new order denying Patterson's motion for new trial on July 24, 2025. Patterson filed a timely notice of appeal on August 18, 2025. The appeal was docketed to this Court's term beginning in December 2025 and submitted for a decision on the briefs.

Kontina testified that, just "seconds later" as she was backing out, she "heard gunshots." She stopped her car and saw Patterson walking out of the house. She did not see anything in his hand. Patterson then asked Breyon to take him home. Kontina heard Z. S. "hollerin[g] and screamin[g]." When Kontina opened the screen door, Bentley was on "on the floor," and Z. S. and Williams were coming out of the bedroom. Kontina did not see any guns in the house at that point. She called 9-1-1 around 7:00 a.m., and while the police were on their way, Kontina asked Williams to "[g]o in the house and get the weed out the house."

When Detective Bradley Winn and Officer Dylan Barrett, the officers dispatched to the scene, arrived at the house, Kontina and Z. S. were found outside, "yelling, screaming, and crying." Williams was inside "standin[g] in the middle of the livin[g] room" and said that he "had just woken up." Bentley was "lying on his back" with a "gunshot wound to his head" and was pronounced dead. After clearing the house and making initial observations, Detective Winn and Officer Barrett cleared the scene and Sergeant Byrony Harris

3

took over as lead investigator. Sergeant Harris observed no damage to the front door or to the house.

Bentley's autopsy revealed that he had been shot twice in "very rapid succession" – once in the lower neck and once in his head. The State's medical examiner testified that both shots followed a downward trajectory[2] and were likely fired from more than a couple of feet away. Two spent 9mm shell casings, fired from the same gun,[3] were recovered from inside the home.

Williams testified that he was asleep in a room off the living room. When Williams woke up and saw that Bentley had been shot, he grabbed his nephew and "ran out the door." He did not see anyone else in the house at that time, did not see Patterson anywhere, and denied being the shooter. When asked about it on cross-examination, Detective Winn testified that he "believe[d] that" Officer Barrett's

---

[2] According to the State's expert, "the shooter would have [had] to be standing up above [Bentley's] head firing down into the body" to cause these types of wounds. **«V6. 28»**

[3] The State's expert in firearms analysis testified that the shell casings were consistent "with being fired from the same … Glock nine millimeter pistol." **«V5. 292»**

report "might" have included seeing Williams come out of the bathroom upon arrival at the scene.

At trial, Breyon's testimony surrounding Bentley's death was extremely limited.[4] He only remembered seeing Bentley with two guns that day – one in his hand and one in his hip pocket. However, in his initial interview with detectives on April 24, 2016, Breyon was able to provide more, though contradictory, details. In the first version of his story, Breyon said that he was not present during the incident. About halfway through his interview, he changed his story to reflect that he was present and corroborated most of what the other witnesses had said. Breyon said that, prior to the shooting, he saw Bentley with two handguns. Breyon and Kontina were outside of the house when they heard gunshots. He maintained, however, that Patterson ran out of the house saying, "[H]e tried to kill me, he tried to kill me." Breyon then drove Patterson away from the home.

In Z. S.'s interview, he said that he "heard the gunshot," woke

---

[4] At the time of trial, Breyon was in a wheelchair and said that he had been "shot three times" (unrelated to this case) and suffered from "head trauma," which included memory loss.

up, and saw Patterson, whom Z. S. referred to by the nickname "Yah," "r[u]n out the door," telling Breyon to "take me home, take me home." Z. S. also said that he saw Patterson holding a gun. He then said that he heard Breyon and Patterson "pulling off." Z. S. got up and saw a man on the floor with blood coming out of his head. He said that Williams, who was on the couch, "got up and looked and ran outside." Z. S. said that Williams went back inside – though he did not know why – and was there when the police arrived. Z. S. went outside after Kontina came in and saw Bentley on the floor.

Patterson went to the police station for an interview four days after the shooting. He claimed that Bentley ran into the house talking about a "gray car" coming by, then "shots rang out," and Patterson was "out the door." Patterson stated that he did not know who was shooting but suggested to detectives that someone might have been shooting from the gray car. At no point during the interview did Patterson claim that Bentley tried to kill him, nor did he say anything about getting Breyon to drive him away from the location.

Both Breyon and Williams submitted to a gunshot residue ("GSR") test. The State's GSR expert testified that "[g]unshot primer residue is a collection of microscopic particles that are formed when a firearm is discharged." No particles characteristic of GSR were found on Breyon's hands. "[T]wo particles characteristic of GSR" were found on Williams's hands. According to the expert's testimony, this indicates that Williams was in "close proximity to a firearm upon discharge or touched a surface that had GSR on it." This "small amount" of GSR could be found on a person who was in the same room as a firearm when it went off. The expert also testified that "washing your hands is the most effective way of losing any particles if there were particles present."

1. Patterson first claims that the evidence presented at trial was legally insufficient to support the verdicts of malice murder and possession of a firearm by a convicted felon during a crime because he was not the shooter.[5] We disagree.

---

[5] Patterson does not dispute that he was a convicted felon at the time of the shooting.

When this Court reviews the sufficiency of the evidence as a matter of constitutional due process, we review the evidence in the light most favorable to the jury's verdict and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 US 307, 319 (1979); *Fuller v. State*, 322 Ga. 188, 191 (2025). "This limited review leaves to the jury the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts." *Wilkerson v. State*, 317 Ga. 242, 245 (2023) (citation and punctuation omitted).

The evidence was sufficient to sustain Patterson's convictions for malice murder[6] and possession of a firearm by a convicted felon during a crime[7] as a matter of constitutional due process. The State produced evidence that Patterson was the only other person awake

---

[6] OCGA § 16-5-1(a) provides that a "person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being."

[7] OCGA § 16-11-133(b)(1) provides that "[a]ny person who has previously been convicted of ... any felony involving the use or possession of a firearm and who shall have on or within arm's reach of his or her person a firearm during the commission of ... [a]ny crime against or involving the person of another ... and which crime is a felony, commits a felony ... ."

in the house when Bentley was shot. Patterson also admitted to being present but initially pointed to a potential drive-by shooter. However, Bentley's injuries were consistent with someone shooting him from above. And there were no bullet holes through the door or on the side of the house.

The testimony of the witnesses on the scene also supported that Patterson was the shooter. Kontina testified that after hearing gunshots and seeing Patterson leave, she went into the house and found Bentley on the floor as Z. S. and Williams were exiting the bedroom. Z. S. said in his interview that after he awoke to gunshots, he saw Patterson run out the door and heard him ask Breyon for a ride and that he saw Patterson holding a gun. Also, Williams, the only other adult in the house at the time of the shooting, testified that he was not the shooter. Finally, Patterson left the scene without telling anyone what had happened or rendering aid to Bentley. See *Harris v. State*, 313 Ga. 225, 231 (2022) (it is "universally conceded that the fact of an accused's flight … [is] admissible as evidence of consciousness of guilt, and thus of guilt itself").

9

Patterson claims that the evidence was not sufficient because law enforcement found Williams in the bathroom with the water in the sink running and two blood spots in the sink. However, there was no evidence presented at trial that blood was found in the sink.[8] And the only evidence that Williams was in or near the bathroom area after the shooting was Detective Winn's testimony that Officer Barrett's report "might" have said that Williams was seen exiting the bathroom. Moreover, although there was testimony that "washing your hands is the most effective way of losing any particles if there were particles present," the State's GSR expert explained that the two particles of GSR found on Williams's hands could have resulted from being in the same small room where the shooting took place or by touching a surface in the room. The weight and credibility of such evidence is to be weighed by the jury, not this Court. See *Ellington v. State*, 314 Ga. 335, 341 (2022) ("[T]he resolution of any such conflicts or inconsistencies in the evidence is

---

[8] It appears that Patterson is relying on a police report in the record that was never provided to the jury, which noted the blood spots found in the sink.

for the jury, and we will not reweigh that evidence on appeal.").

Although Patterson does not cite to OCGA § 24-14-6, he also argues that the circumstantial evidence did not exclude the alternative hypothesis that Williams was the perpetrator. OCGA § 24-14-6 provides that "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." Even assuming that there was no direct evidence, such that OCGA § 24-14-6 applies, the evidence presented as described above permitted the jury to reject the hypothesis that Williams was the shooter and find beyond a reasonable doubt that Patterson was the shooter. "Whether any alternative hypotheses are reasonable and whether the circumstantial evidence excludes any such hypotheses are questions for the jury and we will not disturb the jury's findings on those questions unless they are insupportable as a matter of law." *Rashad v. State*, 318 Ga. 199, 206 (2024) (citation and punctuation omitted).

2. Patterson next claims that the trial court erred by denying

11

Patterson's motion for new trial under OCGA § 5-5-20 and § 5-5-21, also known as the thirteenth-juror standard. There is no error here. "This Court presumes, in the absence of affirmative evidence to the contrary, that the trial court properly exercised its discretion pursuant to OCGA §§ 5-5-20 and 5-5-21." *Holmes v. State*, 306 Ga. 524, 528 (2019). Here, in the order denying the motion for new trial, the trial court identified the correct legal standard, reviewed the evidence, and found that the verdict was not contrary to the law or the principles of justice and equity.

Therefore, the record shows that the court exercised its discretion as the thirteenth juror, and "once we have determined that the trial court properly exercised its authority in refusing to grant a new trial on the general grounds, we cannot review the merits of that decision by the trial court." *Allen v. State*, 315 Ga. 524, 531 (2023) (cleaned up). This claim of error presents nothing further for us to review.

3. Finally, Patterson claims that he received ineffective assistance of counsel in multiple ways. However, as Patterson

12

acknowledges, these claims were not raised in the motion for new trial even though Patterson was represented by new counsel after trial. Because the ineffective assistance of counsel claims were not raised at the "first possible stage of post-conviction review," these claims are waived for purposes of review by this Court. *White v. Kelso*, 261 Ga. 32, 32 (1991); see also *Patterson v. State*, 314 Ga. 167, 171 (2022).

*Judgment affirmed. All the Justices concur.*